## THE NORMANNIA.

### BEERS v. HAMBURG-AMERICAN PACKET CO.[1]

(District Court, S. D. New York. June 21, 1894.)

1. **CARRIERS OF PASSENGERS—CONTRACT OF CARRIAGE—STEERAGE PASSENGERS.**
The mere taking of steerage passengers from an infected port, on a regular passenger steamship accustomed to carry steerage, is no breach of the ship's contract of carriage with a cabin passenger, or a breach of any duty that the ship owes to him.

2. **SAME—INFORMATION RESPECTING VOYAGE—MISREPRESENTATIONS.**
While a shipowner may not be bound to give information in respect to a future voyage to one who has already contracted for a passage, yet, if he does give information, knowing that the passenger will act thereon, he is bound to give it honestly, and without deceit.

3. **SAME—MISREPRESENTATIONS—ACTION BASED ON—ADMIRALTY—JURISDICTION.**
An action based upon false representations in regard to a voyage is within the jurisdiction of the admiralty, though such representations were made on land, before the voyage was begun, and after the contract of carriage was entered into, when they were made with reference to the contract of carriage, and for the purpose of inducing the shipper to carry out his contract, and when the damages alleged to have arisen from them occurred upon the sea, in the course of maritime transportation. Whether such false representation would sustain a suit in rem, quaere.

4. **SAME—FALSE REPRESENTATIONS BY AGENT—SCOPE OF EMPLOYMENT—LIABILITY OF PRINCIPAL—PUNITIVE DAMAGES—ACTUAL DAMAGES.**
Libelant, who had purchased a passage on the steamship Normannia, a Hamburg steamship, but who, owing to the subsequent outbreak of cholera at Hamburg, had determined to forfeit his passage in case the ship was to carry steerage passengers, made inquiries of the London agents of the ship as to whether the Normannia would carry steerage on the voyage in question. The London agents promised to inquire of the home office of the company at Hamburg, but did not do so; but, on receipt of a telegram from the home office, peculiarly worded, and ambiguous, informed libelant that no steerage passengers would be carried. The court found, on the evidence, that the defendant company had no intention to deceive their agents or others by this telegram, but that the agents made an unwarranted use of it, and in other respects did not deal frankly or honestly with libelant, but intentionally suppressed certain facts in regard to the steerage passengers, of which the Normannia in fact carried 500. Cholera broke out among them and among the crew during the voyage, with the result that the vessel was quarantined on arrival at New York, and libelant was put to inconvenience and suffering, to recover for which this suit was brought. Held, that the intent of the company not to deceive freed it from liability for punitive damages, which libelant claimed in addition to his actual damages,

[1] Reported by E. G. Benedict, Esq., of the New York bar.

but that the company was responsible for the false representations of its agents, given in the line of their employment; and, as these representations were made to libelant, an intending passenger, in relation to a contemplated voyage, and were within the scope of the agents' authority, their deceit rendered the company liable for libelant's actual damages.

5. SAME—TORT—DAMAGES—PROXIMATE—CONNECTION—PRESENCE OF STEERAGE PASSENGERS.

The Normannia, as a vessel from an infected port, and as having cholera among her crew, would have been quarantined the same length of time, whether steerage passengers were aboard or not; and hence the respondent urged that libelant had suffered no damage from any misrepresentations. Libelant claimed that, but for the deception, he would not have been on board at all, and hence would have escaped the quarantining and its consequences. *Held* that, while to recover damages for a tort they must be proximately and naturally connected with and flow from it, yet, as cholera did in fact appear among the steerage passengers, and the detention of the ship was due to that fact at least as much as to cholera among the crew, the libelant's damage did happen in part from the subject-matter of the deceit, which was sufficient to render the respondent liable.

6. SAME—REMOTE DAMAGES—LIABILITY.

After the Normannia had been quarantined, the health authorities of the state removed the cabin passengers to another steamer, and afterwards to a temporary quarantine station, in the expectation of improving their condition. In both of these places the passengers suffered the greatest discomfort. *Held*, that such damage could not in this case be charged against the respondent, because the removal of the passengers was not the Normannia's act, and also because the incidents which followed the removal were not produced by the steerage passengers, nor were they the natural results of the removal, but arose from wholly independent and fortuitous causes.

7. SAME—DAMAGES.

On all the facts of this case, *held*, that libelant should recover against respondent as his actual damages the sum of $500, from which should be deducted $100 as the price of his passage ticket, which would have been lost had the libelant not returned on the Normannia.

This was a libel by Alfred B. Beers against the steamship Normannia, her engines, etc., and the Hamburg-American Packet Company, owner.

Benedict & Benedict, for libelant.

Wheeler, Cortis & Godkin, for defendant.

BROWN, District Judge. The above libel was filed against the steamship Normannia in rem, and against the Hamburg-American Packet Company, her owner, in personam. The libel alleges false representations made to the libelant by the company's agents in London just prior to his embarkation on the Normannia on August 27, 1892, and at the time of the outbreak of cholera at Hamburg; that the libelant, who had previously bought a first-cabin ticket for passage by the Normannia from Southampton to New York, but who desired to surrender it in case she carried steerage passengers, through fear of contagion and quarantine, was induced to take passage on the Normannia at Southampton on August 27th, on the agents' assurance that no steerage passengers were on board; whereas in fact she had 500 steerage passengers, who had embarked at Hamburg on the 25th; that in consequence of the presence of the steerage passengers, and of the outbreak of cholera among them,.

the libelant was detained at quarantine 13 days, and subjected to much suffering, sickness, and subsequent loss of time, for which suitable damages are claimed.

The libel also alleges various breaches of duty in the performance of the contract of carriage, viz., in receiving steerage passengers on board at Hamburg; in not properly inspecting and purifying them; in not providing sufficient medical attendance; in not properly dealing with those attacked with cholera on the voyage; in not taking proper precautions against the spread of the disease on board, and in not properly providing and caring for the condition and treatment of passengers who were not attacked, after the arrival of the ship in New York.

1. For faults in the execution of the contract of carriage, and the damages accruing therefrom, a privilege upon the ship arises by the general maritime law; and such a privilege is also specially given by the German Code, art. 452, § 2; Id. art. 757, § 9. But none of the alleged breaches of contract are sustained by the evidence, except the bare fact that the Normannia took steerage passengers; and the circumstances show manifestly that this was neither a breach of the libelant's contract of carriage, nor a breach of any duty that the Normannia owed to him. For it had long been the custom of the Normannia and other fast steamers of the line, to carry steerage passengers, as the libelant knew, or is presumed to have known. The libelant's contract of carriage had been made in the ordinary course of business, by the purchase of his ticket some time before the outbreak of cholera at Hamburg. When the ticket was purchased there were no representations, and no expectation, that steerage passengers would be excluded from the ship. Contracts for the carriage of steerage passengers on the Normannia had been previously made as usual; they had come to Hamburg accordingly; and their legal right to transportation was precisely the same as that of the libelant. It was doubtless the duty of the owners, upon the outbreak of cholera at the port of departure, to take all known precautionary measures for the purification of the ship, and to prevent from embarking all persons, whether of the crew, steerage, or other passengers, who, on examination, might show reasonable probability of infecting the ship. Measures to this end were in fact taken by the owners, and there is no evidence of remissness in this particular.

On arrival at New York, the officers of the ship and the agents of the company seem to have been most energetic in their efforts, and liberal in their expenditures, for the health and comfort of the passengers, and the protection of the ship, and her company, against infection. Nearly $37,000 extra expenses were incurred by the company in this work.

2. The principal ground of the libel, however, is the charge of falsely representing that there were no steerage passengers on board the Normannia, whereby the libelant was induced to take passage on that ship, to his alleged injury and damage, as above stated. The libelant had, no doubt, a right to decline to take passage on the Normannia, and to forfeit his passage money, if he

chose to do so, for any reason, whether good or bad; and in a matter likely to affect his health or comfort, he had certainly a moral claim on the company and its agents for any reasonable information that might aid him in forming a judgment whether to forfeit his contract and refuse to go on the Normannia or not. It may be that the libelant had no legal right to claim information, and that the company was under no legal obligation to afford him information, for the purpose of enabling him to avoid his contract. If the company, or its agents, had, on inquiry, refused any such information, I do not know of any mode in which they could have been legally forced to give it, or to pay damages for withholding it; but if they chose to answer such inquiries, knowing that the libelant intended to, act upon their information, they were bound, by the obligations of good faith, to answer honestly, and without deceit; just as a person inquired of as to the personal responsibility of another, is bound to answer in good faith, and without deceit, if he answers at all. The gist of an action for false representations is deceit; to sustain it, a fraudulent intent, or its legal equivalent, must appear. Marsh v. Falker, 40 N. Y. 562; Wakeman v. Dalley, 51 N. Y. 27, 35; Daly v. Wise, 132 N. Y. 306, 312, 30 N. E. 837; Stewart v. Ranche Co., 128 U. S. 383, 9 Sup. Ct. 101; Iron Co. v. Bamford, 150 U. S. 665, 673, 14 Sup. Ct. 219. And the same rule is applicable to this branch of the libel.

3. It is urged that the alleged false representations, being no part of the contract of carriage, but subsequent to it, and made on land, are not the subject of an action in admiralty, because not maritime. I cannot sustain this objection; for the reason, that the alleged representations were not independent of the maritime contract of carriage, but were made with evident reference to it, and made for the purpose of inducing the libelant to carry out that contract; and for the reason also that the damages which are alleged to have arisen from the false representations, arose upon the sea, in the course of maritime transportation. Though the origin of the tort, i. e., the false representations, began upon land, its consummation, effect, and damage, arose upon the water; and this locus of the damage is sufficient to give the admiralty jurisdiction. The Plymouth, 3 Wall. 20; Leonard v. Decker, 22 Fed. 741, and cases there cited.

It may be doubtful, considering the decision of Mr. Justice Nelson in the case of The Eli Whitney, 1 Blatchf. 360, Fed. Cas. No. 4,345 (see, also, The Baracoa, 44 Fed. 102; The Electron, 48 Fed. 689), whether such false representations would sustain an action in rem; but this is now immaterial, since the owner being sued in personam has appeared in the action, and on the attachment of the vessel, has procured her release on stipulation; so that the cause is now before the court as a suit in personam, for an alleged maritime tort; and as such it is maintainable if the averments of the libel as to the wrong, and as to the damage, are sustained by the evidence.

The steamship arrived in this port on the 3d of September. Up to that time but five deaths had occurred on the ship from cholera, viz., one, a second cabin passenger, 57 years of age, and four children

in the steerage, of whom three belonged to one family. Four other persons on board were also sick with cholera on arrival, September 3d, viz., two firemen, and two children in the steerage; of these one fireman and one child died on the following day, September 4th. Heinrich Lammers, a nurse in the steerage, 47 years of age, and Otto Engel, a stoker, were also attacked with cholera on September 4th, both of whom died that day, or the next. The entire number of cases of cholera on board during the voyage, and after arrival, were, therefore, eleven; three of them firemen, one a second-cabin passenger, and six in the steerage; of the latter all were children save one.

On account of these various cases of cholera, and because the vessel came from an infected port, she was detained at quarantine, by the order of Dr. Jenkins, the health officer. On Sunday, September 4th, the day after arrival, all the steerage passengers were removed to Swinbourn Island. Their quarters on the ship were at once disinfected. Provision was made for removing the crew in two squads as fast as possible, and for disinfecting the forecastle. No case of cholera having appeared among the first-cabin passengers, and only one among the second-cabin passengers; and no quarantine accommodations on shore being ready for so large a number of first and second cabin passengers (about 500), these passengers remained on board the Normannia until September 10th, when they were transferred to the steamer Stonington, in the expectation of greater security from contagion; but the conveniences on the Stonington being inadequate, the passengers were the next day again transferred to the Cepheus, for the purpose of being taken to Fire Island, a temporary quarantine station hastily procured, some 30 miles distant from Sandy Hook. The Cepheus upon her first trip thither was unable to effect a landing there, owing to the darkness and heavy weather, and the passengers were returned the same night to the Stonington. The next day another attempt was made by the Cepheus to land the passengers at Fire Island; but so great was the prevailing excitement, that they were met by an angry and threatening mob, who prevented their landing until the following day, the 13th September, after which the passengers were comfortably provided for until the 16th, when they were again brought to this port and discharged from quarantine, after an entire detention of 13 days.

The condition of the passengers while upon the Cepheus was wretched in the extreme. The libelant claims that through the mental and physical suffering arising from the detention in quarantine, and from the apprehension and excitement caused by the exposure of the passengers to cholera while upon the Normannia, and his sufferings on the Stonington and the Cepheus, he was rendered ill, and was incapacitated from his usual employment for a month. He claims damages for this actual loss of time, and such additional damages for the deceit, and the mental suffering, as may be properly awarded.

The evidence shows that the libelant was traveling in company with Mr. Reid and Mr. Hawley, and that they had purchased tickets for their passage upon the Normannia some time previous. On

Wednesday, the 24th of August, being in London, and hearing of the outbreak of cholera at Hamburg, they determined not to return by the Normannia, in case she took steerage passengers, as was her custom. They accordingly went to the branch office of Smith, Sundius & Co., who were the London agents of the steamship company, in Cockspur street, made known their determination, and asked to be informed whether the Normannia would take steerage passengers; and if so, whether their passage money would be returned. The agent replied that he did not know, as to either point, but promised to ascertain by telegraph, and directed the inquirants to call the following day. Several times on the following day (Thursday) the same inquiries were renewed at the Cockspur street office, and the same answer returned. On Friday morning the inquiries were again renewed, and assurances were then given by the agent that an answer would be obtained and sent to their hotel during the afternoon. At about 4 or 5 o'clock that afternoon an answer in writing was received at the hotel, addressed to the three passengers. This letter has not been preserved; but its substance is testified to most specifically by Mr. Reid, who says that the dispatch was on two sheets of paper of continuous reading matter, covering three points: First, that it was the Normannia that would sail from Hamburg; second, "no steeragers carried by our line;" and third, "no refund of passage money," with something about "fast steamers plying to Southampton." Mr. Berting, the agent in charge of the Cockspur street office, who had had the conversation with these passengers, testifies that this despatch was part of a telegram received from the Hamburg office by Smith, Sundius & Co. at 1:57 p. m. of Friday, the 26th, at their main office in Leadenhall street, London, and thence transmitted to him by telephone. This telegram was as follows, the words in brackets translating the cipher:

(A) "Smith, Sundius & Co.: Nigger stagnant [Normannia 27 August, the following are the numbers vacant]: Gents berths 1, 21, 3 in 4 persons room 62 marks 400 one 85 second class full; instruct Beebe calling and other inquirants that refund of passage does not take place measures to secure sanitary safety of cabin passengers rigorously taken no steeragers allowed by our line fast steamers only plying Southampton and New York Nigger [Normannia takes] no passengers [to] Southampton."

The libelant and his friends relying upon the letter sent to them by Mr. Berting as an assurance that there were no steerage passengers on the Normannia, took the steamboat train at 9 o'clock the following morning from London to Southampton, went thence by steam tender some seven or eight miles to the Normannia, and arrived on board at about 1 o'clock p. m.; they did not learn that any steerage passengers were on board until some 15 to 20 minutes after the tender had returned.

For the libelant it is contended that the company's telegram above quoted, and the agent's letter based upon it, were not merely untrue, but that they were intentionally misleading and fraudulent, so as to subject the defendant company to punitive damages. As bearing upon that issue, other testimony has been received of an-

swers made to similar inquiries by other passengers at about the same time, both in London and in Southampton; that of Mr. Fisher, Mr. Taylor, and Senator McPherson, being the most important. Mr. Fisher's inquiries were made at the agents' main office in Leadenhall street; Mr. Taylor's and Senator McPherson's at the agents' branch office at Southampton, which was in daily communication by telegraph with the London office. Upon commissions to take the depositions of witnesses in London and Hamburg, all the letters, correspondence and telegrams between the parties concerning the matter have been called for; and, according to the testimony, all have been produced, except the inquiry made by Beebe, which could not be found. From this testimony it appears that Beebe was the only passenger who telegraphed from London directly to the office of the company at Hamburg; and his inquiry was whether the Normannia would carry steerage passengers, and if so, he desired the return of his passage money.

4. From a careful collation of all the testimony, I am satisfied that in sending the above telegram to the London office, there was no intention on the part of the company at Hamburg, or any of its officers or servants in the Hamburg office, to deceive, or to mislead, either their London agents, or any passengers who might make inquiries of them in regard to steerage passengers on the Normannia, or desire a refund of passage money. The telegram, it must be borne in mind, was not sent in answer to any previous inquiry made by the London agents; for when it was sent no such inquiry from them had been received. It was sent at about half past 11 a. m. on the 26th; and the Normannia had already left Cuxhaven the day before, with 500 steerage passengers on board. A few hours afterwards, viz., at 3 p. m. of the 26th, in answer to the following inquiry from the Southampton office of Smith, Sundius & Co.:

(B) "Will the Normannia have steeragers aboard?" the company's reply was immediately sent as follows:

(C) "Normannia has steeragers aboard, but has bill of health."

This was received at the Southampton office on Friday afternoon at about half past 5 o'clock.

The only telegram sent by the London agents at all on this subject, was one sent from the Leadenhall street office at about half past 11 on the 26th, by the superintendent, Sisley, which was received at the Hamburg office at 2 minutes past 2, and was as follows:

(D) "Nigger [Normannia] Mr. Fisher cabin 8, attorney World's Fair, having important business in New York fearing detention quarantine, asks if you will exceptionally refund passage, or how much enable him to proceed Umbria to-morrow; if you wire that no steerage on board and no fear from crew, still hope to induce him to proceed Normannia. Sundius."

—To which the company at once sent the following answer, received at London at 5 :25 p. m.:

(E) "You may refund Fisher passage amount in case you can sell cabin 8; otherwise forfeited."

This telegram (E), considering the language of the inquiry (D), and the known habit of the Normannia to carry steerage passengers,

was plainly equivalent to a statement that the Normannia had steerage passengers on board; and it could not possibly be otherwise interpreted; for if she had no steerage aboard, the answer could not have omitted to say so, instead of saying that the passage money must be forfeited. The three telegrams (A, C, E) were all sent by the same man in the Hamburg office; and if he had intended by the first telegram (A) to mislead the London agents, or any inquiring passengers in London or Southampton, for the purpose of inducing them to take passage on the Normannia, under the false impression that no steerage passengers were on board, it is not conceivable that he should have immediately sent from Hamburg either of these answering telegrams (C and E) as soon as the inquiries were received; had there been any such fraudulent purpose, he would have delayed answering, or answered evasively, or not at all. The explanation of the first telegram (A) sufficiently appears, and is briefly as follows:

On the 25th, when the threatening character of the cholera epidemic first became known in Hamburg, the directors of the steamship line held a meeting there, and resolved to take no more steerage passengers for the present, but to run their fast steamers between New York and Southampton only. This had reference, however, to the vessels sailing after the Normannia, beginning with the Columbia ; for at that very time the Normannia's 500 steerage passengers were already embarking, to be taken 30 miles below to Cuxhaven, where the Normannia then lay; and on the same day the Normannia dropped 30 miles still further down the river with her steerage passengers on board. After the meeting of the directors on the 25th, this resolution was telegraphed on the same day to the Associated Press in London for publication, stating that this service would commence with the Columbia; and a letter fully explaining this was on the same day written and forwarded to Smith, Sundius & Co., both at Southampton and at London. This letter would not be received in London, however, until the 27th. The Normannia sailed on the following day, the 26th, at about noon, from her last port, 60 miles below Hamburg; the last railroad train to reach the steamer left Hamburg at about 7 a. m.

At about 11 o'clock of the 26th, Mr. Fincke, who kept the account of the passengers' rooms, was preparing a telegram to the London office to state what rooms or berths remained undisposed of. This was in the usual course of business. While doing so, he was directed by Mr. Steinz, the office manager, to answer Beebe's inquiry, and also to state the substance of the directors' resolution, and of the letter sent the day before with reference to the future business of the company. Mr. Fincke thereupon incorporated in the telegram (A) the part following the statement of rooms unsold, and closed with a second reference to the Normannia (Nigger), stating that she would take no passengers from Hamburg to Southampton. The beginning and the end of the telegram referred to the Normannia; the middle portion was intended to relate only to the future business of the company, and to inform their agents of the results of the directors' meeting in reference to it. The telegram was not ad-

dressed to passengers, nor intended to be shown to them. It was a private telegram to their own agents only, to be read and interpreted by them in the light of their knowledge of the company's business and modes of correspondence. The repetition of the word "nigger" near the close, by which the subject of the Normannia was resumed, and the immediate association of the phrase "no steeragers forwarded by our line" with the words following, viz., "fast steamers only plying Southampton and New York," which could not possibly apply to the Normannia, were both strong indications that the reference to steerage passengers did not include the Normannia; while the previous statement that "no passage money would be refunded," having reference to the Normannia, was an implication that she had steerage passengers, since that was the only ground on which a refund had been asked. These circumstances, together with the fact that within a few hours afterwards two other telegrams were dispatched by the same man in answer to inquiries, the one (C) to Southampton, and the other (E) to London—the former explicitly stating, and the latter necessarily implying, that the Normannia had steerage passengers on board, are sufficient in my judgment, wholly to relieve the Hamburg office from the charge of bad faith, or of any intent to mislead anyone on that subject.

5. The case of the London agents in that regard seems to me to be quite different. The evidence leaves no doubt that in answer to the repeated and urgent inquiries of the libelant, and of various other persons, the London agents undertook to procure the information desired. Mr. Berting on three successive days, at the Cockspur street office, promised to cable to the Hamburg office for information; but notwithstanding these repeated promises, no inquiry was ever made by him, or by his principal, Mr. Sisley, of the Leadenhall street office, whether the Normannia would carry steerage passengers or not; nor was any inquiry whatsoever made in the libelant's behalf. The only telegram sent by them was the special telegram (D, supra) sent by Mr. Sisley so late as 11:25 a. m. of Friday, the 26th, on Mr. Fisher's account; an inquiry which Mr. Fisher succeeded in getting forwarded only after persistent efforts, which could not be frustrated by the employés with whom he first came in contact. From the language of this telegram (D), as well as from Mr. Berting's own testimony, it is clear that up to about 2 p. m. of Friday the London agents assumed and expected that the Normannia would carry steerage passengers as usual. They had no reason to expect otherwise. They knew from the usual course of business that a large number of steerage passengers must have been booked for the Normannia, and already arrived in Hamburg before the outbreak of cholera. and would embark by the 25th; and in the absence of information, there was no reason to suppose that any change in the company's arrangements could be made to exclude them from the Normannia. That the agents expected no such change, is further shown by the telegrams exchanged between themselves. About noon of Friday, the 26th, the Southampton office telegraphed to the London office as follows:

(F) "Have you received instructions from the company if any one wants refund Normannia."

—To which, at 12:15 Mr. Sisley replied:

(G) "Have no instructions about refund, but have contented ourselves by saying if company considers safe send steamer, must be safe for passengers; however, expect reply from company shortly to special application we made for refund."

Not long after, at about 2 p. m., telegram (A) was received by Mr. Sisley, who sent it by telephone to Mr. Berting, as above stated. So far as relates to passengers or refund, this telegram was an accidental one; for it was not sent in answer to any inquiry by the agents. They were bound, therefore, to observe carefully all its language. On its face, if it did not show conclusively that the passage about steeragers could not refer to the Normannia, yet it did show at least such doubt and ambiguity that the agents were not justified in making use of the telegram as a positive assurance that the Normannia had no steerage passengers.

Mr. Sisley and Mr. Berting, however, both testify that they understood this telegram to mean that the Normannia had no steerage passengers. But their conduct before and after does not suffer me to accept this explanation. During the three days previous, during which these numerous inquiries were made, they did not expect, and had no reason to expect, that the Normannia would omit steerage passengers; yet they did not state their reasonable knowledge and expectation in that regard. They made many promises daily to inquire by telegraphing to Hamburg whether the Normannia would take steerage passengers, yet never made any such inquiry; and when, in sending the Fisher telegram, a special opportunity for such an inquiry arose, it is plain that Mr. Sisley purposely avoided making this inquiry. When the accidental telegram (A) was received, though its terms were plainly so dubious as to put him on his guard, Mr. Sisley at once made use of it to assure Mr. Fisher, who happened to call at about the time it was received, that there were positively no steerage passengers on the Normannia. He knew, and he told Mr. Fisher, that it was not an answer to his telegram; and he promised Mr. Fisher to send him the answer which was expected to be received later in the day. At half past 5 the answer was received at Mr. Sisley's office, which, by necessary implication, showed that steerage passengers were on board; yet this answer was never sent to Mr. Fisher, nor to the Cockspur street office. Mr. Berting, instead of sending to the libelant, at his hotel, an answer in his own words, sent a copy of a part of the telegram (A) without the means of explanation he himself possessed, and without any suggestion of the doubts his own testimony satisfies me he had.

On the following morning, as Mr. Taylor and Senator McPherson testify, they were assured, on inquiry at the Southampton office, that no steerage passengers were on board, though express information to the contrary had been received at that office the afternoon before; and during the passage upon the tender from Southampton to the steamer, one of the London agents, or their representative, was on board, who must by that time have been perfectly informed

of the fact that steerage passengers were on the Normannia, through the company's telegrams to the London and the Southampton offices the afternoon before; yet no information was given to the numerous persons on the tender, who were known to be proceeding on the faith of the assurances previously given them.

I am constrained to find, therefore, that the London agents did not deal frankly or honestly in regard to the inquiries made of them; that trusting if the company thought it safe to send out the steamer, it would be safe for them to send off the London passengers, they suppressed their own reasonable knowledge and expectation, and put off and deluded the libelant and other inquirers with false promises, which they did not fulfill, and did not intend to fulfill; that the accidental telegram (A) received by the agents from the company did not warrant the assurances which they based upon it, as the agents had sufficient reason to know; and that afterwards when the facts became sufficiently known to the agents both at London and Southampton, the facts were not communicated as they had promised, and had opportunity to do, and as good faith required, but were intentionally suppressed. These findings would be sufficient to sustain an action for false representations against the agents personally; it is sufficient as against the company also, if the company is liable for the misconduct of its agents in such a matter.

6. It is urged, however, that the defendant company is not liable for any such misconduct of their English agents, because it arose, as it is said, while the agents were acting wholly outside of the scope of their employment; and that whatever the agents did, or undertook to do, for the libelant, was either a mere matter of courtesy, or else was done as agents of the libelant, and not of the respondents.

I cannot sustain this view. The agents of the company in London were the ordinary channel of communication in reference to a great variety of matters pertaining to the transportation of passengers, which were evidently reasonably necessary in the successful prosecution of the company's business. The evidence shows that changes in passages, after tickets had been obtained and paid for, were frequently made through correspondence between the agents and the company. Such correspondence was apparently a part of the agents' ordinary duties. Applications of this kind were frequent. The company dealt with the public in that way; and the public relied on the agents as the representatives of the company, as the latter well knew; and their telegram (A) to the London agents on its face furnishes evidence that the company recognized this usage, and the duty of their agents to give information to passengers; since the telegram directed them to "instruct Beebe, and other inquirants." on these subjects.

I find, therefore, that the agents in undertaking to procure the desired information and to report to the libelant and others making inquiries, were acting within the scope of their employment by the defendant company; and that their misconduct charges the principals with the actual damages caused thereby (Story, Ag. [9th Ed.]

452; Griswold v. Haven, 25 N. Y. 595; Fifth Ave. Bank v. Forty-Second St. & G. St. Ferry R. Co., 137 N. Y. 231, 33 N. E. 378), though not with any punitive damages, as neither the company, nor its officers in Hamburg, are personally chargeable with any deceit.

7. It is contended, however, that the libelant suffered no damage from the misrepresentations, inasmuch as the detention of the steamer would have been precisely the same had no steerage passengers been on board.   The evidence, I think, sustains the latter fact. The testimony of Dr. Jenkins, and the record of the arrival of other vessels, show that all vessels coming from infected ports, even though no cholera was on board, were detained in quarantine, usually about a week, and sufficiently to satisfy the health officer that there was no danger of contagion; and that in cases where cholera had broken out during the voyage, the vessel was held for a longer time until the period for any probable further development of cholera was passed.

Upon the Normannia, besides the cases of cholera among children in the steerage, there were, as above stated, two cases among the crew, and one in the second cabin during the voyage; and on the day after arrival two additional cases appeared among the crew. Upon the evidence, I must find, therefore, that the detention of the Normannia's passengers would have been the same, had no steerage passengers been on board.   The presence of the steerage passengers, it is therefore urged, made no difference to the libelant.   He was willing, it may be said, to take the chances of detention through the sailing of the vessel from an infected port, and of any additional detention that might come from the outbreak of cholera among the crew, or the second cabin passengers; and these chances having turned against him, he suffered no more detention than the risks that he was willing to assume actually produced; and that, therefore, no damage arose from the misrepresentations about the steerage.

The libelant, on the contrary, urges that he had a right to determine what risks he would take, and what not; and that but for the deception, and the suppression of the truth he would not have been on board; and that his embarkment was induced solely by the misrepresentations which led him into the detention he had meant to escape.

I do not think the mere circumstance that he would "not have been on board" but for the false representations, would be sufficient to make the defendant liable for whatsoever might happen to the libelant's injury while on the ship on which the representations had induced him to embark, if the injury was not proximately related to, and did not naturally grow out of, the subject-matter of the misrepresentations.   Had the libelant, in this instance, suffered no detention through cholera, or quarantine, but had been injured through a collision with another ship, or by some accident on the Normannia itself, in no way connected with the presence of steerage passengers, it surely would not have been claimed that the defendant, if not otherwise in fault, would have been responsible to the libelant for such damages, merely because steerage passengers were

on board, and because the libelant would not have embarked on the Normannia had he known of their presence; since neither the cause of the injury nor the damage would, in the case supposed, have had any connection with the presence or the absence of steerage passengers.

To recover damages for a tort, they must be proximately, and naturally, connected with, and flow from it; they must be such as might be within the contemplation of the parties as a natural consequence of the wrongful act, as distinguished from a merely accidental result. Smith v. Bolles, 132 U. S. 125, 130, 10 Sup. Ct. 39; Railroad Co. v. Reeves, 10 Wall. 176. The subject-matter of the inquiry, and of the deceit, in this case, was the presence or absence of steerage passengers on the Normannia as related to cholera contagion and consequent detention of the vessel in quarantine. If no cases of cholera had appeared among the steerage passengers, and the detention of the vessel had arisen solely from the other conditions and circumstances proved, I think this libel must have been dismissed; for the reason that though the deceit was established, no damage would be shown to have resulted from it.

But in this case, cholera did appear among the steerage passengers: it appeared among them first, and chiefly. If the ship might have been detained for the same period had no steerage passengers been aboard, it is equally true that the detention would have been just the same had there been no cholera except in the steerage. Cholera in the steerage was at least as much a cause of the detention, as cholera in the second cabin and among the crew. The detention was, in fact, due to both alike. The damage in this case, therefore, did happen in part directly from the subject-matter of the deceit, and not wholly from an independent cause, such as a cyclone, or a collision; and as the presence of steerage passengers, and of cholera among them, was certainly a contributing cause of the damage, that is sufficient to make the defendant liable.

Although the detention of the vessel, moreover, might have been the same had no steerage passengers been on board, still there is no doubt, I think, that the alarm and excitement produced both on the ship, and on shore, when the facts became known, were mainly due to the cholera among the steerage passengers. The facts concerning cholera on the ship were carefully suppressed during the voyage. It was not until arrival, and upon the receipt of the New York newspapers, that the passengers discovered, as one of the witnesses (Senator McPherson) states, that "they had a perfect Vesuvius of cholera on board." Beyond the single case in the second cabin, had there been no cholera except the few cases among the crew, the alarm among the passengers, as well as the general excitement and apprehension would have been much less. I cannot, therefore, acquit the respondents on the ground that the presence of steerage passengers made no difference to the libelant, and was not one of the proximate causes of the damage.

8. The same rule that limits damages to the natural and proximate results of the wrong, requires the exclusion of a considerable part of the libelant's claim. Aside from some indisposition during the two

or three days after arrival at New York, which was soon relieved by prescriptions, and apart from the deprivations and discomfort while on board the Stonington and the Cepheus, the libelant does not appear to have suffered any definite illness. He did not contract cholera, nor any other ailment; but in consequence of the excitement and anxiety while on board the Normannia, Stonington and Cepheus, he was unable, as he states, during the three weeks after his arrival home to do more than a week's work. This loss, with the loss of two weeks in quarantine, make up the loss of a month's time, which, at the rate of his usual average yearly earnings would amount to at least $800.

As the vessel was from an infected port, however, she would have been detained a week in any event, though she had had no cholera, and though no steerage passengers had been on board. The first week's detention must, therefore, be deducted as independent of the misrepresentations. The distressing incidents, moreover, so graphically described by the witnesses, which arose after the removal of the passengers from the Normannia on September 10th in the expectation of improving their condition, cannot be charged against the Normannia; (1) because the removal of the passengers was not the Normannia's act, and (2) because the incidents which followed were not produced by the steerage passengers, nor were they the natural results of the removal, nor such as might have been expected to flow from it; but they arose from wholly independent and fortuitous causes, not to be anticipated. I must, therefore, exclude those painful incidents, and the mental suffering that attended them, as direct subjects of compensation, and also their effects in contributing to the libelant's subsequent disability for work. How much of the subsequent two weeks' disability should be ascribed to causes occurring before the removal from the Normannia, and how much from what occurred afterwards, is mostly a matter of surmise; the testimony of the libelant seems to lay chief stress upon the latter cause.

Excluding, therefore, such elements of damage as are not properly attributable to the presence of steerage passengers, I think $500 will be a proper compensation for the libelant's loss of time, and for his suffering, so far as legally recognizable. From this sum is to be further deducted the price of a return ticket, say $100, which would have been lost if the libelant had not returned upon the Normannia; since he evidently would have had no legal claim upon the company for its return. There remains $400, for which a decree may be entered in favor of the libelant, with costs.