489 F.2d 152
 In the Matter of The Complaint of Gypsum Carrier, Inc.,
Bareboat Charterer, and Oceanic Carrier, Inc.,
Owner of the MOTOR SHIP PACIFIC CARRIER,
for exoneration from or
limitation of liability.
GYPSUM CARRIER, INC., Third Party Plaintiff-Appellant,
v.
UNION CAMP CORPORATION, Third Party Defendant-Appellee.
 No. 73-1651.
 United States Court of Appeals, Fifth Circuit.
 Feb. 8, 1974.
 
 George H. Chamlee, Gustav R. Dubus, III, Savannah, Ga., for Gypsum Carrier, Inc.
 Kirk M. McAlpin, Atlanta, Ga., Stanley R. Wright, Jacksonville, Fla., for Union Camp Corp.
 Spencer Connerat, Jr., Savannah, Ga., for the Seaboard Coast Line Railroad Co.
 Fred S. Clark, Savannah, Ga., Manuel A. Sequeira, Jr., New York City, for Underwriters of Seaboard Coast Line Railroad Co.
 Edward T. Brennan, Savannah, Ga., for M/V Mariner & M/V Costos Frange.
 W. J. Snowden, Moore-McCormack Lines, Inc., New York, City, Courtney W. Stanton, Asst. Atty. Gen. of Ga., Atlanta, Ga., for Ga. Ports Authority.
 Thomas S. Gray, Jr., Savannah, Ga., for Hamburg-Suderamerikanische Dampschiffahrts Gesellschaft.
 Gignilliat & Abbott, Savannah, Ga., for Aztec Trading Co. S.A.
 Julian F. Corish of Corish, Smith, Remler & Moore, Savannah, Ga., for American Oil Co.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before GEWIN, AINSWORTH and NORGAN, Circuit Judges.
 AINSWORTH, Circuit Judge:
 
 
 1
 The question for decision in this matter is whether there is jurisdiction in admiralty of claims of the bareboat charterer and the owner of a vessel against a shore-based paper mill, engaged in a non-maritime manufacturing activity, on allegations that smoke emitted from the mill so obstructed navigation as to cause the vessel to collide with a railroad bridge spanning the waterway on which it was proceeding to sea.
 
 
 2
 On April 23, 1971, the M/S PACIFIC CARRIER, owned by Oceanic Carrier, Inc., and under bareboat charter to Gypsum Carrier, Inc., appellants herein, discharged a cargo of gypsum rock at Savannah, Georgia, and was proceeding downstream on the Savannah River ship channel bound for Halifax, Nova Scotia. As the vessel approached a railroad Bridge spanning the channel, it suddenly became engulfed in smoke, fumes and gases emanating from the smokestacks of a pulp and paper mill owned by Union Camp Corporation, situated on the bank of the channel immediately upriver from the bridge, causing loss of all visibility by the vessel's crew and resulting in a collision by the vessel with the bridge. Both bridge and vessel sustained heavy damage.
 
 
 3
 Seaboard Coast Line Railroad Company, owner of the bridge, immediately filed an in rem action for damages against the vessel and caused its seizure. Gypsum Carrier, Inc. thereafter instituted the present exoneration and limitation of liability proceeding (pursuant to 46 U.S.C. 183-189), in which Oceanic Carrier, Inc., the shipowner, intervened. Gypsum and Oceanic later filed in this limitation proceeding a third-party complaint and cross-claim, respectively, under Rule 14(c), Fed.R.Civ.P.,[1] against Union Camp, the allegations contained therein charging that the smoke emitted by the paper mill interfered unreasonably with the vessel's use of the waterway and constituted a nuisance and an obstruction to navigation. In the cross-claim of Oceanic there were further allegations that Union Camp's activities violated the Georgia Air Quality Control Act (Chapter 88-9, Code of Georgia) as well as federal regulations pertaining to navigation lights and signals (33 C.F.R. 68.01-10 et seq.). The acts complained of were said to be the proximate cause of the collision. The parties sought damages and recovery over, and that all judgment of claimants in the limitation proceeding be entered against third-party defendant Union Camp under Rule 14(c), Fed.R.Civ.P.; and Oceanic sought in the event of a finding of mutual fault divided damages in accordance with the admiralty rule.
 
 
 4
 This appeal arises out of the district court's order sustaining Union Camp's motions to dismiss for lack of admiralty jurisdiction, the third-party complaint and cross-claim of shipowners against it.[2] An interlocutory appeal was authorized under 28 U.S.C. 1292.
 
 
 5
 We have carefully analyzed the order of the district court which dismissed the impleader and cross-claim for lack of admiralty jurisdiction over Union Camp, as well as the two decisions on which the district judge apparently justified his conclusions, namely, Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), and Peytavin v. Government Employees Insurance Company, 5 Cir., 1972, 453 F.2d 1121. In our view, the cited cases not only do not support the conclusion reached by the district court, but to the contrary sustain admiralty jurisdiction herein. Accordingly, we reverse the order of the district court dismissing the impleader and cross-claim of shipowners against Union Camp.
 
 
 6
 A secondary issue raised below is whether the doctrine of ancillary jurisdiction extends to admiralty as well as to civil impleader so as to dispense with any requirement of an independent basis of admiralty jurisdiction to implead a third party under Rule 14(c), Fed.R.Civ.P. We do not reach this question inasmuch as the maritime nature of the claims herein furnishes the independent basis required for admiralty jurisdiction under the rule.
 
 
 7
 In Executive Jet, supra, a jet airplane, taking off from an airport adjacent to Lake Erie in Cleveland, Ohio, struck a flock of seagulls, causing it to crash and sink in the navigable waters of nearby Lake Erie. The owners of the airplane brought suit in admiralty for its loss. The question before the Supreme Court was 'whether the petitioners' suin for property damage to the aircraft, allegedly caused by the respondents' negligence, lies within federal admiralty jurisdiction.' 409 U.S. at 250, 93 S.Ct. at 495. The Court held that it did not, concluding that 'maritime locality alone is not a sufficient predicate for admiralty jurisdiction in aviation tort cases,' 409 U.S. at 261, 93 S.Ct. at 501, and after a comprehensive discussion of the complexities of problems involved in the application of the strict locality test,[3] said further:
 
 
 8
 'All these and other difficulties that can arise in attempting to apply the locality test of admiralty jurisdiction to aeronautical torts are, of course, attributable to the inherent nature of aircraft. Unlike waterborne vessels, they are not restrained by one-dimensional geographic and physical boundaries. For this elementary reason, we conclude that the mere fact that the alleged wrong 'occurs' or 'is located' on or over navigable waters-- whatever that means in an aviation context-- is not of itself sufficient to turn an airplane negligence case into a 'maritime tort.' It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the absence of legislation to the contrary.'[4]
 
 
 9
 409 U.S. at 268, 93 S.Ct. at 504.
 
 
 10
 The holding in Executive Jet, as indicated from the foregoing language of the opinion, is confined of course to aircraft. Nevertheless, the Court spoke with approval of the increasing tendency of Congress and the courts to predicate maritime jurisdiction generally on the relationship of the wrong to maritime activities instead of on the locality of the tort alone. In this respect it said:
 
 
 11
 'In sum, there has existed over the years a judicial, legislative, and scholarly recognition that, in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test.'
 
 
 12
 409 U.S. at 261, 93 S.Ct. at 501.
 
 
 13
 As an example of cases holding that admiralty jurisdiction was improperly invoked because the tort, while having a maritime locality, lacked a significant relationship to maritime navigation and commerce, the Court in Executive Jet cited Peytavin v. Government Employees Insurance Company, 5 Cir., 1972, 453 F.2d 1121, the second case relied on by the district court in dismissing the claims against Union Camp below. In Peytavin, we concluded that a claim for whiplash injuries sustained by an automobile passenger as the result of a rear-end collision with another automobile was not within the jurisdiction of admiralty, notwithstanding the fact that plaintiff's vehicle was parked on a floating pontoon in navigable waters. Our reasoning was that the claim lacked 'substantial connection with maritime activities or interests.' 453 F.2d at 1127.
 
 
 14
 Both Executive Jet and Peytavin represent a departure from application of the strict locality rule. They stress substantiality of the connection between the tort and maritime activities as a more realistic criterion. In the instant case, if locality of the tort were the only factor having a maritime connection, admiralty jurisdiction would be lacking. However, the locality of the tort, the Savannah River channel, where the 'substance and the consummation of the injury'[5] presumably occurred, is only one maritime-connected factor. This is not one of those 'borderline' problem cases, alluded to in Executive Jet,[6] devoid of any relationship between the tort and traditional maritime activities other than location. The combination of factors in the instant case, in the context of admiralty jurisdiction, supplies what was lacking in Executive Jet and Peytavin-- a substantial maritime connection. Unlike the aircraft in Executive Jet and the colliding automobiles in Peytavin, the motor vessel PACIFIC CARRIER is by its very essence maritime. The alleged cause of its collision with the railroad bridge, i.e., the smoke emitting from Union Camp's smokestocks, constituted a navigational hazard by obstructing the vision of the ship's crew. The activities of the shipowners at the time of the collision were essentially maritime-- the transporting of cargo by vessel on navigable waters. Thus the fact that the agency said to have obstructed navigation here had a nonmaritime origin is irrelevant to any issue since it caused injury to a vessel then under way on navigable waters. The maritime nature of the tort is therefore undeniable. Executive Jet and Peytavin are not opposed to our holding here; to the contrary, the propriety of our determination in supported by those decisions.
 
 
 15
 Appellee makes much of the fact that its paper mill is land based and engaged in a non-maritime industry, in its attempt to avoid admiralty jurisdiction. But this fact is not decisive. See Kelly v. Smith, 5 Cir., 1973, 485 F.2d 520.[7] In Kelly, the issue presented was whether claims for injuries inflicted on water-borne, fleeing deer poachers, by hunting rifles fired from shore by club members of a private hunting club, were within admiralty jurisdiction. We analyzed Executive Jet and Peytavin and found that under the rationale of those decisions the circumstances in Kelly were sufficiently related to maritime activities to sustain admiralty jurisdiction. 'Firearms-- and the injuries they caused,' we said, 'are not so inherently indigenous to land as to preclude any maritime connection.' 485 F.2d at 526. By analogy, smoke and the wind that blows it across a body of water, as well as the resultant hazard and obstruction to navigation, are much less inherently indigenous to land. the vessel in Kelly was a 15-foot outboard motor boat, being used as a getaway vehicle by the escaping poachers. By comparison the vessel here is an ocean-going, bulk-cargo carrier, actively engaged in maritime commerce at the time of the collision. We emphasized in Kelly the traditional concern of admiralty for the safety of maritime commerce, saying:
 
 
 16
 'Policy militates toward admiralty jurisdiction in this case. The admiralty jurisdiction of federal courts stems from the important national interest in uniformity of law and remedies for those facing the hazards of waterborne transportation. Rifle fire directed at a vessel, albeit a small one, on a major commercial artery, and injuring the pilot, presents sufficient danger to maritime commerce for the federal courts of admiralty to assume jurisdiction . . ..' 485 F.2d at 526.
 
 
 17
 When we consider the navigational hazards caused by blinding smoke and gases, as evidenced by the extensive damage both to vessel and bridge in this case, the Kelly parallel is clear. The tort claims of the shipowners here are of far greater substance in a maritime context than were those approved by us in Kelly.
 
 
 18
 Several cases cited by appellant, though pro-Executive Jet, are agreeable in principle with the holding in that case, and are pertinent to the issue of maritime jurisdiction here. Locality is still a viable consideration under Executive Jet, and it is apparent that the courts in the following cases stressed this principle. It is also true, as in Executive Jet, that these cases involved torts of a maritime nature. For example, in this circuit's case of Southern Bell Telephone & Telegraph Co. v. Burke, 5 Cir., 1933, 62 F.2d 1015, we were concerned with a libel in admiralty by a shipowner for injury to its vessel's smokestack while passing through the draw span of a highway bridge over a river and coming in contact with telephone lines strung from one bank of the river to the other. We rejected the respondent's contention that there was no jurisdiction in admiralty as follows:
 
 
 19
 'The wrong and the injuries complained of having been wholly consummated while the steamer was traveling in the navigable waters of the United States, the claim based thereon is within the admiralty jurisdiction. Atlee v. Packet Co., 21 Wall. 389, 22 L.Ed. 619; Philadelphia, Wilmington & Baltimore R.R. Co. v. Philadelphia & Havre de Grace Steam Towboat Co., 23 How. 209, 16 L.Ed. 433; Panama Railroad v. Napier Shipping Co., 166 U.S. 280, 17 S.Ct. 572, 41 L.Ed. 1004; Cleveland, Terminal & V. Railroad Co. v. Steamship Co., 208 U.S. 316, 28 S.Ct. 414, 52 L.Ed. 508, 13 Ann.Cas. 1215. We are of opinion that there is no merit in the suggestion to the effect that the asserted claim was kept from being cognizable in admiralty by the circumstance that the thing with which the steamer collided was connected solely with upland beyond the shore or border of the river, no part of it being in or covered by navigable waters. Gonsalves v. Morse Dry Dock Co., 266 U.S. 171, 45 S.Ct. 39, 69 L.Ed. 228; F. S. Royster Guano Co. v. Outten (C.C.A. 4 Cir.) 266 F. 484.'
 
 
 20
 In the America, D.C., E.D.N.Y., 1940, 34 F.Supp. 855, a barge owner filed a proceeding in admiralty against the owner of a tanker with which it collided and defendant impleaded E. I. DuPont & Company on allegations that it allowed its shore-based plant to emit fumes or gases over the adjacent waters in such volume and density that claimant of the vessel was unable to navigate and to avoid doing the damage for which the libel was filed. To respondent's exception to the jurisdiction the court held:
 
 
 21
 'The following cases indicate that a cause in personam in admiralty exists, if it be proven that a tort arising on land takes effect on navigable waters, to the injury of a vessel on behalf of which the cause is asserted: Philadelphia, W. & B.R.R. Co. v. Philadelphia, etc., Co., 23 How. 209, 16 L.Ed. 433; Leonard v. Decker, D.C., (2 Cir.) 22 F. 741; Galena, D.D. & M. Packet Co. v. Rock Island, etc., 6 Wall. 213, 18 L.Ed. 753; The Normannia, D.C., (2 Cir.) 62 F. 469, at 472; Hermann v. Port Blakely Mill Co., D.C., (9 Cir.) 69 F. 646; Dorrington v. Detroit, 6 Cir., 223 F. 232, at 242; Smith v. Lampe, 6 Cir., 64 F.2d 201.'
 
 
 22
 In Smith v. Lampe, 6 Cir., 1933, 64 F.2d 201, two vessels collided in a thick fog allegedly because of the negligent signalling by respondent with the horn of his automobile to the vessels in the fog. Libelant contended that respondent's actions negligently interfered with the navigation of the boats and that the negligence was the proximate cause of the damage. The Sixth Circuit answered the jurisdictional question holding that the suit was properly brought in admiralty and rejected respondent's contention that 'if any tort was committed, it was committed on land,' thus making the action one at common law rather than admiralty. The court said that where the negligent act originates on land and the damage occurs on water, the cause of action is within the admiralty jurisdiction; that 'the locality of the thing to be considered is that of the thing injured, and not of the agent causing the injury, and that when the injury is to a vessel afloat, even though the negligence originated on land, the tort is maritime, and within the admiralty jurisdiction.' Id. at 202.
 
 
 23
 Whether we apply the criterion of Executive Jet and look to 'the relationship of the wrong to traditional maritime activity,' 409 U.S. at 261, 93 S.Ct. at 501, or the virtually identical test of Peytavin to determine if the tort has a 'substantial connection with maritime activities or interests,' 453 F.2d at 1127, we reach the definite conclusion that the claims asserted against Union Camp are maritime in nature and clearly within admiralty jurisdiction.
 
 
 24
 Reversed.
 
 
 
 [1]
 Rule 14, Fed.R.Civ.P.:
 Third-Party Practice
 (c) Admiralty and Maritime Claims. When a plaintiff asserts an admiralty or maritime claim within the meaning of Rule 9(h), the defendant or claimant, as a third-party plaintiff, may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences. In such a case the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff, in which event the third-party defendant shall make his defenses to the claim of the plaintiff as well as to that of the third-party plaintiff in the manner provided in Rule 12 and the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff. As amended Jan. 21, 1963, eff. July 1, 1963; Feb. 28, 1966, eff. July 1, 1966.
 
 
 [2]
 The district judge noted in his order that 'diversity apparently exists between the shipowner and Union Camp. It is possible that some remedy is available to the shipowner at this stage of the litigation independently of admiralty.'
 
 
 [3]
 The Supreme Court in Executive Jet expressed its dissatisfaction with such a test: 'The petitioners' argument, if accepted, would make jurisdiction depend on where the plane ended up-- a circumstance which could be wholly fortuitous and completely unrelated to the tort itself. The anomaly is well illustrated by the hypothetical case of two aircraft colliding at a high altitude, with one crashing on land and the other in a navigable river. If, on the other hand, the respondents' position were adopted, jurisdiction would depend on whether the plane happened to be flying over land or water when the original impact of the alleged negligence occurred. This circumstance, too, could be totally fortuitous. If the plane in the present case struck the birds over the Cleveland Lakefront Airport, admiralty jurisdiction would not lie; but if the plane had just crossed the shoreline when it struck the birds, admiralty jurisdiction would attach, even if the plane were then able to make it back to the airport and crash land there. These are hardly the types of distinctions with which admiralty law was designed to deal.' 409 U.S. at 267, 93 S.Ct. at 504
 
 
 [4]
 It is interesting to note that the Supreme Court did not irrevocably foreclose the possibility of characterizing as maritime even an aircraft under circumstances where the function of the airplane would parallel the function of the vessel: 'An aircraft in that situation (flying from New York to London and crashing in the mid-Atlantic) might be thought to bear a significant relationship to traditional maritime activity because it would be performing a function traditionally performed by waterborne vessels.' 409 U.S. at 271, 93 S.Ct. at 506. In the instant case we have a vessel performing a function traditionally performed by a vessel, the transportation of cargo on navigable waters
 
 
 [5]
 The traditional locality test for determining when a tort is within the admiralty jurisdiction historically dates back to The Plymouth, 70 U.S. (3 Wall.) 20, 35, 36, 18 L.Ed. 125 (1866): 'The wrong and injury complained of must have been committed wholly upon the high seas or navigable waters, or, at least, the substance and consummation of the same must have taken place upon these waters to be within the admiralty jurisdiction.' Despite such broad language, the Supreme Court said in Executive Jet, 'that this Court has never explicitly held that a maritime locality is the sole test of admiralty tort jurisdiction.' 409 U.S. at 261, 93 S.Ct. at 499
 
 
 [6]
 409 U.S. at 259, 93 S.Ct. at 498
 
 
 [7]
 'It should also be noted that, in attempting to determine exactly what constitutes a tort for maritime jurisdictional purposes, the courts have generally made 'tort' synonymous with 'injury', and have looked to the place where the impact causing the injury occurred, rather than to the place where the negligent act occurred.' 7A, Moore, Federal Practice .325(2) n. 4