In re HIJACKING OF PAN AMERICAN WORLD AIRWAYS, INC. AIRCRAFT AT KARACHI INTERNATIONAL AIRPORT, PAKISTAN ON SEPTEMBER 5, 1986.

Sadanand SINGH, Individually and as Executor of the Estate of Kala Singh; Samir Singh, By and Through Sadanand Singh, Guardian Ad Litem; Kalpana Singh, By and Through Sadanand Singh, Guardian Ad Litem, Plaintiffs,

v.

PAN AMERICAN WORLD AIRWAYS, INC., a New York Corporation; Pan Am World Services, Inc., a Florida Corporation; Alert Management Systems, Inc., a Florida Corporation, Alert Management Systems, Inc., a Florida Corporation, Defendants.

No. MDL 724 (JES).
M 21–44.

United States District Court,
S.D. New York.

Feb. 14, 1996.

Kreindler & Kreindler, New York City (Marc S. Moller, of counsel), for plaintiffs.

Seltzer, Caplan, Wilkins & McMahon, San Diego, California (Bruce Fagan, Reg A. Vitek, of counsel), for Singh plaintiffs.

Coddington, Hicks & Danforth, Redwood City, California (Clinton H. Coddington, of counsel), Shea & Gardner, Washington, DC (Richard M. Sharp, of counsel), for defendants.

## MEMORANDUM OPINION
## AND ORDER

SPRIZZO, District Judge.

Plaintiffs Sadanand Singh, individually and as executor of the Estate of Kala Singh, and Samir and Kalpana Singh, through a Guardian Ad Litem, (collectively, the "Singh plaintiffs") and other plaintiffs bring the instant actions against defendants Pan American World Airways, Inc. ("Pan Am"), Pan Am World Services, Inc. ("PAWS"), and Alert Management Systems, Inc. ("AMS") for damages arising out of the hijacking of a Pan Am airplane in Karachi, Pakistan in 1986. Pursuant to 28 U.S.C. § 1404(a), the Singh plaintiffs move to transfer venue to the Southern District of California for trial on the remaining non-common claims. Pursuant to Federal Rules of Civil Procedure 50, 54(b) and 58, Pan Am cross-moves for entry of judgment limiting the amount of damages to $75,000 under the Warsaw Convention and dismissing the remaining non-common claims.[1]

## BACKGROUND

In 1986, in response to increasing public concern over threats against United States air carriers operating international flights, Pan Am contracted with AMS to provide a security system for its international flights. *See* Declaration of Bruce H. Fagan Sworn to November 12, 1993 ("Fagan Decl.") ¶¶ 2–9, Exhs. 1–8. Pan Am thereafter implemented and advertised its "Alert Security Program" as one which provided enhanced security measures. *See id.*

On September 5, 1986, Pan Am flight number 73 departed Bombay, India en route to New York, New York with a scheduled intermediary stop at Karachi International Airport in Karachi, Pakistan. Joint Pre–Trial Order ("PTO"), Undisputed Facts ¶ 1. Plaintiff Sadanand Singh, his wife Kala, and their two minor children Samir and Kalpana were passengers on board flight 73. Declaration of Sadanand Singh Sworn to November 12, 1993 ("Singh Decl.") ¶ 2.

While flight 73 was on the ground at Karachi International Airport, terrorists boarded and assumed control of the aircraft. PTO, Plaintiffs' Contentions of Fact ¶¶ 86–87, Defendant's Contentions of Fact ¶¶ 245–48. While in control of the aircraft, the terrorists opened gunfire on the passengers, killing about twenty passengers and injuring numerous others. *See* PTO, Plaintiffs' Contentions of Facts ¶¶ 95–97, Defendants' Contentions of Facts ¶ 283. During the hijacking, Kala Singh was killed, and Mr. Singh and his two children were injured. *See* Singh Decl. ¶ 3.

On February 23, 1987, Mr. Singh filed an action against Pan Am on behalf of himself and his two minor children in the United States District Court for the Southern District of California, claiming damages for wrongful death, personal injury and false advertising. *See Singh, et al. v. Pan American World Airways, Inc., et al.*, 87 Civ. 3108 (JES). Numerous other wrongful death and personal injury lawsuits relating to the hijacking of Pan Am flight 73 were filed against Pan Am in various courts across the United States. *See* Declaration of Randolph S. Hicks, Esq. Sworn to October 15, 1993 ("Hicks Decl.") ¶ 3:

By Order filed April 7, 1987, the Judicial Panel on Multidistrict Litigation selected venue in the Southern District of New York for consolidated pre-trial proceedings pursuant to 28 U.S.C. § 1407.[2] *See* PTO, Jurisdiction ¶ 2. At the time of consolidation, eighteen actions, including the Singh action, had

---

**1.** Pan Am consents to entry of judgment in the amount of $75,000 per passenger seat in cases governed by the Warsaw Convention and $20,000 in cases governed by the Hague Protocol. *See* Memorandum in Support of Pan Am's Motion for Judgment as a Matter of Law Dismissing All of Plaintiffs [sic] Claims in Excess of $75,000 at 1.

**2.** On January 8, 1991, Pan Am voluntarily initiated Chapter 11 reorganization bankruptcy proceedings pursuant to 11 U.S.C. 362(a), thereby causing an automatic stay of the actions. The United States Bankruptcy Court of the Southern District of New York subsequently granted conditional relief from the automatic stay for the instant trial on liability and damages. *See* Hicks Decl. ¶ 6; *see also* Stipulation and Order Modifying Lifting of Automatic Stay, filed January 5, 1995.

been filed. *See* Pan Am's Notice of Motion dated October 15, 1993, Ex. C. As of October 15, 1993, thirty-five actions arising out of the hijacking of Pan Am flight 73 had been consolidated before this Court.

On October 15, 1993, Pan Am moved pursuant to 28 U.S.C. § 157(b)(5), or in the alternative pursuant to 28 U.S.C. § 1404(a), to transfer eighteen cases filed in the Central District of California, including the Singh action, to the Southern District of New York for a consolidated liability trial. *See* PTO, Jurisdiction ¶ 1. By Order dated December 13, 1993, this Court granted Pan Am's motion and, pursuant to Federal Rule of Civil Procedure 42(a), consolidated those cases for trial of all common liability issues. *Id.*

On April 14, 1994, after a six week jury trial, the jury found that Pan Am's conduct in connection with the Alert Security Program constituted willful misconduct. However, the jury also found that the willful misconduct

was not a proximate cause of the damages claimed.[3]

Thereafter, pursuant to 28 U.S.C. 1404(a), the Singh plaintiffs moved for transfer of the remaining claims to the Southern District of California[4] for trial on the ground that since the Singh plaintiffs actually relied upon the misrepresentations made by the defendants in connection with the Alert Security Program, their claims were not common to those already tried. Pan Am opposed that motion on the grounds that (1) it is entitled to judgment notwithstanding the verdict on the issue of willful misconduct; (2) that any remaining claims are, in any event, preempted both by the Warsaw Convention and by the Airline Deregulation Act.[5] Pan Am also sought entry of judgment under the Warsaw Convention in the amount of $75,000 per passenger seat and dismissal of all remaining claims.[6]

[3.] Four special interrogatories were put to the jury as follows:

1) Do you find by a fair preponderance of the evidence that Pan American World Airways, Inc. engaged in willful misconduct, as defined by the Court, in connection with the Alert Security Program?
The jury answered "yes."
2) Do you find by a fair preponderance of the evidence that Pan American World Airways, Inc. engaged in willful misconduct, as defined by the Court, by flying into Karachi International Airport on September 5, 1986?
The jury answered "no."
3) If the answer to Question # 1 is Yes, do you find by a fair preponderance of the evidence that the willful misconduct of Pan American World Airways, Inc., in connection with the Alert Security Program, was a proximate cause of the hijacking?
The jury answered "no."
4) If the answer to Question # 2 is Yes, do you find by a fair preponderance of the evidence that the willful misconduct of Pan American Airways, Inc. in flying into Karachi International Airport on September 5, 1986 was a proximate cause of the hijacking?
The jury left the fourth interrogatory unanswered because the jury's answer to the second interrogatory made it inapplicable.
Trial Transcript at 2734–35, 2804–05.

[4.] The Singh plaintiffs assert that their remaining non-common claims include a "damages claim based on common law," set forth in their Elev-

enth Claim for Relief of the Second Amended Complaint, and a "fraud-based Warsaw claim" in which the fraud constitutes the willful misconduct, set forth in the Third Claim for Relief of the Second Amended Complaint. *See* Memorandum of Points and Authorities in Support of the Singh Family's Motion to Change Venue, n. 3.

[5.] AMS and PAWS join Pan Am's motion as it applies to the *Singh* action, 87 Civ. 3108 (JES), which is the only action in which they remain parties. AMS and PAWS are also subject to the protections and limitations of the Warsaw Convention, *see In re Air Disaster at Lockerbie*, 776 F.Supp. 710 (E.D.N.Y.1991) (holding Lockerbie plaintiffs' claims against AMS and PAWS are likewise subject to conditions and limitations of Warsaw Convention).

[6.] Pan Am seeks entry of judgment in the amount of $20,000 per passenger seat on the claims governed by the Hague Protocol rather than the Montreal Agreement. The parties have indicated to the Court that they agree that the Hague Protocol and its $20,000 limitation of liability may apply to the actions brought by plaintiffs Dilip Parekh, Parag Sheth, Father Anthony Theodore and Kodiyttu Kurian. *See* Defendants' Opposition to Singh Family's Motion to Change Venue at 1–2; Transcript of Oral Argument dated September 30, 1994 at 2–3. In any event, the applicability of the Hague Protocol limitations is not currently before the Court. However, if the parties cannot reach a final agreement on the applicability of the Hague Protocol limitations in

## DISCUSSION

The Warsaw Convention [7] limits liability of international air carriers for damages resulting from an "accident," which has been construed to include hijacking or terrorist activity. *See Pflug v. Egyptair Corp.*, 961 F.2d 26, 29 (2d Cir.1992); *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 33 (2d Cir.1975) (en banc), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976). Article 17 of the Warsaw Convention states that:

> The Carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Article 22 of the Warsaw Convention limits the liability created by Article 17.[8] The Montreal Agreement,[9] which subsequently modified the Warsaw Convention, subjects the airlines to absolute liability when the flight itinerary includes a stop in the United States. The Montreal Agreement states that:

> [The] limit of liability for each passenger for death, wounding, or other bodily injury [shall be the sum of US] $75,000 inclusive of legal fees and costs, except that, in case of a claim brought in a State where provision is made for separate award of legal fees and costs, the limit [shall be the sum of US] $58,000 exclusive of legal fees and costs.

Article 25 of the Convention lifts the liability limitation set forth in Article 22 where the damage is "caused by" the carrier's willful misconduct. Article 25 provides:

> (1) The carrier shall not be entitled to avail himself of the provisions of this con-

vention which exclude or limit his liability, if the damage is caused by his willful misconduct or by such default on his part as ... equivalent to willful misconduct.

Pan Am's threshold contention is that the Court need not even address the issues of whether, and to what extent, the jury's finding of willful misconduct in the conduct of its "Alert Security Program" can or should bar any remaining claims on behalf of passengers who actually relied upon those representations, because that finding should be set aside as unsupported by the trial proof. The Court rejects that contention.

■ Ample evidence was elicited at trial which rationally supports the jury's conclusion that Pan Am made representations of enhanced security measures in connection with its "Alert" program, which Pan Am either 1) knew could not or would not be implemented; or 2) had no basis to believe that they could or would be implemented. Without reciting in detail all of the trial proof regarding this issue, suffice it to say that the evidence established, *inter alia*, (1) that Pan Am made the alleged misrepresentations in an effort to encourage increased travel at a time when concerns about security had led to declining revenues, Trial Transcript ("Tr.") at 80, 204, 356; (2) that Pan Am was aware that terrorist activity, especially at European and other middle eastern high risk airports, including Karachi, was a major factor in passengers' security fears, *id.* 81, 82; (3) that very little was actually done to provide enhanced security at any foreign airports, notwithstanding Pan Am's well publicized campaign, *id.* at 209–19, 444–47, 480, 828–29, 898; *see also* Plaintiffs' Exhs. 2, 6, 9, 119, 33A; and (4) that virtually nothing was done at

each of these cases, the Court will resolve that issue at a later time.

7. Convention for the Unification of Certain Rules Relating to International Transportation by Air, done at Warsaw, Oct. 12, 1929, 49 Stat. 3000, reprinted in 49 U.S.C. § 1502 Note, T.S. No. 876, 137 L.N.T.S. 11.

8. Article 22 provides:

> (1) In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs [about

$8,300 in 1934]. Where, in accordance with the law of the court to which the case is submitted, damages may be awarded in the form of periodical payments, the equivalent capital value of the said payments shall not exceed 125,000 francs. Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.

9. Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol Agreement CAB 18990. Pan Am is a signatory to the Montreal Agreement, a private agreement that has been approved by the United States

Karachi Airport, where Pan Am clearly knew that it had very little, if any, control over airport security, Tr. at 93, 116, 248–49, 323, 415, 417, 630, 635–36, 692, 747, 810, 1045, 1983. In the face of this evidence and other proof which is set forth in greater detail in Plaintiffs' Memorandum of Law in Opposition To Defendant Pan–Am's Post–Trial Motion at 4–13, defendants' argument that the jury verdict was either rationally unsupported or against the weight of the evidence, lacks merit.[10]

However, the Court must also reject plaintiffs' contention that since they allege actual reliance on defendants' misrepresentations, they need not prove that those misrepresentations were the proximate cause of plaintiffs' injuries. This argument is based upon the literal language of Article 25, where the French verb "provenir" is used, which plaintiffs contend is properly translated as "arising out" of and not as "caused by," as would be the case if the drafters of the Convention had employed the verb "causer," set forth in the French version of Article 17.[11]

Plaintiffs conclude from this difference in language that plaintiffs' injuries need only bear a reasonable relationship to the representations relied upon, *see Eastern Airlines v. Floyd*, 499 U.S. 530, 535, 111 S.Ct. 1489, 1493, 113 L.Ed.2d 569 (1991) (looking to, *inter alia*, French legal meaning of Convention terms for guidance in interpretation); *Air France v. Saks*, 470 U.S. 392, 399–400, 105 S.Ct. 1338, 1342–43, 84 L.Ed.2d 289 (same), which relationship is established by the fact that protection against terrorist activity was a major reason for the representations made in the "Alert Security Program."

The Court cannot accept that argument for the following reasons.

Article 25 does not in itself create any liability on the part of international air carriers; it merely removes a limitation on the liability already imposed by Article 17 where the airline is guilty of willful misconduct. Thus, where, as here, there is no liability under Article 17 because the defendants' conduct was not the proximate cause of the hijacking, there is no liability that can be increased as a consequence of defendants' willful misconduct. In sum, Article 25 serves only to remove a limitation of a liability that *already exists* under Article 17. *See In re Air Disaster at Lockerbie*, 928 F.2d 1267, 1285–86 (2d Cir.1991); *In re Korean Air Lines Disaster*, 932 F.2d 1475, 1489 (D.C.Cir. 1991); *Floyd v. Eastern Airlines, Inc.*, 872 F.2d 1462, 1484 (11th Cir.1989), *rev'd on other grounds*, 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569. It does not create an additional and independent predicate for liability, and no court has ever so held.

This is especially true since to accept plaintiffs' argument would seriously undermine the Warsaw Convention's primary goal of providing uniformity with respect to the liability of international air carriers, *see O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842, 852 (2d Cir.1984); *Reed v. Wiser*, 555 F.2d 1079, 1089–90 (2d Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977), a goal which the drafters of the Convention did not intend to be impacted by local laws. *See Reed*, 555 F.2d at 1090. Indeed, it is for that reason that the Convention preempts *all claims* arising out of airline operations regardless of the theory upon which they are grounded or where the injury occurs.[12] *See In re Air Disaster at Locker-*

government by order E23680, May 13, 1966 (Docket 17325), 31 Fed.Reg. 7302 (1966).

10. Because the Court has rejected defendants' claim of evidentiary insufficiency, there is no need for the Court to pass upon the issue of whether Pan Am waived this claim by failing to make a timely motion under Federal Rule of Civil Procedure 50.

11. Article 25 of the Warsaw Convention, in its original French version, states, in pertinent part, "[s]i le dommage provient de son dol ou d'une faute qui...." Declaration of Professor Alain Levasseur Sworn to December 6, 1994, at 2.

Article 17 provides in its original French version, in pertinent part, "le transporteur est responsable du dommage survenu en cas de mort ..." and "lorsque l'accident qui a cáuse le dommage s'est produit à bord...." *Id.*

12. Article 24 of the Warsaw Convention provides that, "any action for damages however found can only be brought subject to the Warsaw Convention limitations." *See, e.g., Pflug v. Egyptair Corp.*, 961 F.2d 26, 28–30 (2d Cir.1992) (Convention preempt state law claims); *Chendrimada v. Air–India*, 802 F.Supp. 1089, 1091 (S.D.N.Y. 1992) (Convention preempts breach of contract and negligence claims for personal injury); *Adler*

*bie,* 928 F.2d 1267, 1273 (2d Cir.1991) (state law claims falling within scope of Warsaw Convention are preempted); *see also In re Pan American Corp.,* 950 F.2d 839, 847 (2d Cir.1991) (transferee court in Second Circuit must apply preemption law as construed by the Second · Circuit). It would hardly be consistent with these objectives to apply different standards of causation depending upon whether or not the willful conduct giving rise to plaintiffs' injuries consists of fraudulent misrepresentations. It follows that if plaintiffs' claims cannot be predicated upon the Convention, they cannot be based upon federal or state common law because it is clear and indeed undisputed that plaintiffs' claims arise out of international travel.

Plaintiffs' reliance on *The Normannia,* 62 F. 469 (S.D.N.Y.1894) is misplaced. Not only does that case have no bearing upon the issue of preemption, but even assuming, *arguendo,* that plaintiffs' remaining claims were not preempted by the Convention, *The Normannia* would still not support plaintiffs' argument that the jury's verdict does not bar these claims. In that case, although the court did suggest that there need only be a relationship between the subject matter of the defendants' representation, *i.e.,* that no steerage passengers would sail on the vessel on which plaintiffs booked passage, and plaintiffs' alleged damage, *i.e.,* detention in quarantine as a result of a cholera epidemic among steerage passengers, *id.* at 481, it was nonetheless true that the existence of a cholera epidemic among those passengers was in fact *a proximate cause* of plaintiff's detention. *Id.* Although defendants' misrepresentations did not cause the epidemic, had the defendants' misrepresentations been true, the plaintiffs might not have been detained since those steerage passengers would not have been aboard the vessel.[13] *Id.*

*v. Maley Hungarian Airlines,* 23 Avi.Cas. (CCH) 18, 157 (S.D.N.Y.1992) (Convention preempts claims for emotional distress resulting from hijacking).

13. For the same reason, plaintiffs' reliance on two other cases cited is similarly misplaced. In *O'Hara v. Western Seven Trees Corp. Intercoast Management,* 75 Cal.App.3d 798, 803, 142 Cal. Rptr. 487 (1977), plaintiff's complaint, alleging proximate causation between defendant's failure

In the instant case, defendants' misrepresentation played *no part whatsoever* in causing plaintiffs' injury, except in the sense that but for defendants' misrepresentations, plaintiffs might not have been on board the aircraft. Plaintiffs concede that is not legally sufficient. *See* Memorandum in Support of Singh Family's Motion to Change Venue at 10–11. Thus, unlike *The Normannia, supra,* where, had the defendants' misrepresentations been true, there may well have been no cholera epidemic, or at least a minimized risk of cholera, aboard the vessel, in the instant action, the jury found that, even if all the representations made were true and fully implemented, the hijacking still would have occurred. That verdict forecloses any claims for injuries suffered as·a consequence of the hijacking.

■ Furthermore, even assuming, *arguendo,* that plaintiffs have state and/or federal common law claims which are not preempted by the Convention and are not barred by the jury's verdict, those claims would nonetheless be preempted by the Airline Deregulation Act. *See American Airlines v. Wolens,* —— U.S. ——, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995); *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The Airline Deregulation Act of 1987 ("ADA"), 49 U.S.C.App. § 1301 *et seq.,* contains an express preemption clause providing:

> No State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation,. standard or other provision having the force and effect of law relating to rates, routes, or services of any air carrier...."

Title 49 U.S.C.App. § 1305(a)(1).[14]

While the parameters of preemption under the ADA are not yet clearly defined, where,

to fulfill its representations regarding 24 hour security patrol at its apartment complex and plaintiff's rape, was held sufficient to state a claim. *See also Collins v. American Optometric Ass'n,* 693 F.2d 636 (7th Cir.1982) (defendant misrepresented the ability of his optometrists to diagnose glaucoma). In both cases, had the representations made been true, plaintiffs' injuries would not have occurred.

14. Congress recodified this provision to provide:

as here, the essence of the willful conduct alleged is a false advertising claim, the Court concludes that the survival of that claim would be incompatible with Congress' manifest intent to preempt all state law claims pertaining to airline fares and services.[15]

In *Morales v. Trans World Airlines Inc.*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), the Supreme Court held that the ADA preempts state regulation of matters relating to airline fares and services. Looking to its interpretation of identical preemptive language in ERISA, 29 U.S.C. § 1144(a), the Supreme Court in *Morales,* mindful of the fact that the ADA has a "broad preemptive purpose," *id.* at 383–85, 112 S.Ct. at 2037, interpreted the phrase "relating to" to mean "having a connection with or reference to airline 'rates, routes, or services.'" *Id.* The Court therefore concluded that the ADA preempts state regulation and prohibitions of allegedly deceptive airline advertisement through enforcement of general consumer protection statutes. *Id.* at 391–93, 112 S.Ct. at 2041.

Subsequently, in *American Airlines v. Wolens,* ⸺ U.S. ⸺, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995), the Supreme Court held that with respect to frequent flyer programs, federal law preempted all claims based upon consumer fraud or false advertising. Although the Supreme Court held that the ADA does not preempt claims against air carriers for breach of contract, *see Wolens,* ⸺ U.S. at ⸺, 115 S.Ct. at 824, and did suggest that some personal injury claims may not be preempted, *id.* at ⸺, n. 9, ⸺, 115 S.Ct. at 827, n. 9, 830 (O'Connor, J.,

concurring) (personal injury claim may not be preempted if particular tort claim is not "related to" airline service), those exceptions can have no relevance where, as here, the alleged personal injuries suffered allegedly resulted from plaintiffs' reliance on false representations in the promotion and advertisement of airline services.[16] In sum, because the claims here are not "tenuous, remote or peripheral to" airline services, *Morales* at 389–91, 112 S.Ct. at 2040, but rather at their core, they are preempted by the ADA. *See Vail v. Pan Am Corp.,* 260 N.J.Super. 292, 616 A.2d 523, 526 (A.D.1992) (holding ADA preempts state false advertising claims relating to Alert Security Program because claims "clearly relate[ ] to the 'services' of an air carrier").

## CONCLUSION

For the reasons set forth above, the Singh plaintiffs' motion to transfer is in all respects denied. Defendants' motion for judgment on all claims in the amount of $75,000 per passenger under the Warsaw Convention or $20,000 in the cases governed by the Hague Protocol, subject to offsets in cases where Pan Am has made advances to plaintiffs, is granted. For the reasons set forth above, defendants' motion to dismiss the Singh plaintiffs' remaining non-common claims is granted. The parties shall file a stipulation setting forth which cases are governed by the Hague Protocol and which cases are subject to advance offsets and in what amount, on or before April 22, 1996, and a pre-trial

---

[A] State, political subdivision of a State, or political authority of at least two States may not enact or enforce a law, regulation, or other provision having the force and effect of law relating to a price, route or service of an air carrier that may provide transportation under this subpart."
Title 49 U.S.C. § 41713(b)(1). The change in wording was not intended to be substantive. Pub.L. No. 103–272, § 1(a), 108 Stat. 745 (1994).

**15.** This is especially true here, since the surcharge imposed for the promised enhanced security was a part of the fare structure and was collected as such. Tr. 745, 747–48.

**16.** In their Reply Memorandum of Points and Authorities in Support of the Singh Family's Mo-

tion to Change Venue at 2, the Singh plaintiffs state for the first time that they assert non-common claims for breach of contract which they now argue are not preempted under *Wolens.* The Singh plaintiffs claim that Pan Am breached its contract with the Singh plaintiffs to provide special security, Second Amended Complaint ¶¶ 36–42, and that PAWS and AMS breached their contracts with Pan Am to which plaintiffs were intended third party beneficiaries, *id.* ¶¶ 67–71. However, plaintiffs would still, even on a contract theory, be required to establish that the defendants' breach of contract or fraud caused their injuries, an issue which the jury has already resolved against them. Thus, these claims are also precluded by the jury's finding that the hijacking would have occurred even if defendants had provided the security as advertised.

conference shall be held on May 3, 1996 at 1:00 P.M. in courtroom 705.

It is **SO ORDERED.**