**Russell W. GALBUT, Plaintiff,**

v.

**AMERICAN AIRLINES, INC., Defendant.**

**No. CV–94–5554–(JMA).**

United States District Court,
E.D. New York.

Dec. 2, 1997.

Steven Arensen, Arensen, Dittmar & Karban, New York City, for Plaintiff.

David S. Rutherford, Renzulli, Gainey & Rutherford, New York City, for Defendant.

---

## MEMO AND ORDER

AZRACK, United States Magistrate Judge.

The parties in this action consented to my presiding over the case for all purposes including entry of judgment pursuant to 28 U.S.C. § 636(c)(1) and FED.R.CIV.P. 73. Defendant has made a motion for summary judgment; for the reasons discussed below, that motion is granted.

## FACTUAL BACKGROUND

Because this is defendant's motion, the facts must be viewed in the light most favorable to plaintiff. *Gibson v. American Broadcasting Companies, Inc.*, 892 F.2d 1128, 1132 (2d Cir.1989); *Rombom v. United Air Lines, Inc.*, 867 F.Supp. 214, 222 (S.D.N.Y.1994). Accordingly, the following summary is based on undisputed facts, where they exist, and on plaintiff's version of events where the facts are disputed.

American Airlines allows certain high mileage frequent flyers to upgrade from Coach to first class under certain conditions. Specifically, frequent flyers who accumulate 25,000 miles or more on American Airlines flights during a calendar year are designated Gold AAdvantage members. That status entitles members to upgrade from a full fare coach class seat to a first class seat, on a seat available basis, no earlier than 24 hours before a flight, using Gold AAdvantage stickers. Plaintiff was a Gold AAdvantage member, however his Gold status expired on February 29, 1993 because he had not accumulated 25,000 miles during the 1992 calendar year.

Plaintiff is a real estate developer who travels frequently. In connection with a trip from Miami to New York, and back to Miami on December 2 and 3, 1993, plaintiff purchased a full fare coach class ticket for $910.40. Plaintiff's travel agent reserved for him a first class seat. When plaintiff arrived at the Miami airport on December 2, 1993, plaintiff attempted to upgrade his coach class ticket to first class with unused Gold AAdvantage stickers. According to plaintiff, the gate agent, Roberta Malinsky–Pitt, told plaintiff that the upgrade stickers were stolen. When plaintiff told the gate agent that the stickers had been issued to him by defendant, she told him that he could not use the stickers but that he could upgrade to first class for a payment of only $90.00, using an upgrade procedure available to AAdvantage members. There is no dispute that plaintiff was an AAdvantage member at the time. Plaintiff paid the $90.00.

The gate agent then informed plaintiff that he could not keep his first class reservation for the return trip without paying another

$90.00. The parties dispute the amount that plaintiff was told he would be required to pay, but there is no dispute that plaintiff assured the agent he would make payment in New York. The gate agent, Malinsky–Pitt, then entered two sets of remarks in plaintiff's "Passenger Name Record" [PNR] which is part of defendant's computer system. The remarks stated,

PASSENGER WILL BE PAYING FIRST CLASS FARE ARRIVING ON THE 2ND (OF) DECEMBER FOR THE RETURN ON THE 3RD [OF] DECEMBER. ADVISED PASSENGER IS A REGULAR ADVANTAGE AND CANNOT UPGRADE 48 HOURS IN ADVANCE WITHOUT PAYING FARE. PASSENGER STATES THAT HE WAS A PLATINUM OR GOLD BUT WE CALLED HEADQUARTER GOLD DESK JUST TO VERIFY IT WAS NOT. PASSENGER WAS ABLE TO USE THE ADVANTAGE RATE SINCE HE HAS A FULL FARE TICKET. I STATED SINCE I DIDN'T HAVE THAT MANY UPGRADES ON TODAY'S FLIGHT THAT I WOULD GIVE HIM THE RATE OF UPGRADE, $90.00. PASSENGER "CLEARLY" STATED HE DIDN'T WANT TO SIT IN Y [COACH] AND HE WOULD TAKE CARE OF HIS TICKET FOR THE RETURN ON ARRIVAL INTO JFK. IF PASSENGER DOES NOT CHANGE TICKET TODAY PLEASE MAKE PASSENGER PAY THE APPROPRIATE RATE FROM Y [COACH] TO F [FIRST CLASS] / THANKS MIAMI TL. ATTENTION JFK ... PASSENGER NEEDS TO PAY THE FARE BETWEEN Y TO F. PASSENGER WAS TO GET RE–TICKETED ON THE 2ND [OF] DECEMBER. HE CANNOT UPGRADE WITH REGULAR ADVANTAGE SINCE HE HAS BEEN HOLDING A FIRST CLASS SEAT. PASSENGER WAS ADVISED OF "RULES" ALSO SUPERVISOR IN MIAMI ADVISED TO HIM THE RULES AND HE WAS NOT A GOLD OR PLATINUM. THANKS.

Malinsky–Pitt then reported the incident to Agent Tighe–Rodriguez of the defendant's Fraud Prevention Division.

Plaintiff did not make payment for the return flight upgrade when he disembarked the plane in New York. But when he arrived at John F. Kennedy Airport again on the following day, to return to Miami, he went to the Admiral's Club, of which he was a paying member, and informed the agent, Rose McGovern, that he was supposed to pay an additional $90.00 in order to upgrade his ticket from Coach to first class. McGovern conferred with another agent, Pat LaBella, and then informed plaintiff that he could not upgrade for $90.00 but would have to purchase a booklet of regular upgrade stickers for $320.00. Plaintiff made the payment and McGovern affixed the appropriate number of stickers on Galbut's ticket and issued him a first class boarding pass. According to plaintiff, McGovern also indicated to plaintiff that "there was something crazy on the computer screen that she didn't quite understand" (Pl.'s 56.1 Statement ¶ 10.) In addition, Agent LaBella entered the following remarks into plaintiff's PNR:

PASSENGER ARRIVED AT JFK, HAD GOLD STICKERS IN HIS POSSESSION. INSISTED THAT THE STICKERS WERE SENT TO HIM. WE MADE HIM PURCHASE REGULAR ADVANTAGE STICKERS AND BECAME AWARE OF PROBLEM AFTER PASSENGER PURCHASED REGULAR STICKERS. HE WAS ALREADY IRATE AND TO AVOID MAKING A BAD PROBLEM WORSE WE ISSUED HIS FIRST CLASS BOARDING PASS.

Apparently, although LaBella and McGovern became aware of plaintiff's problem with his AAdvantage status after selling him the upgrade stickers, they did not advise the gate agents that they had sold plaintiff the stickers. (Plaintiff admits, however, that LaBella entered the above remarks on the computer system.)

After leaving the Admiral's Club, plaintiff proceeded to the gate, presented his ticket and boarding pass, and boarded the plane. After the gate agent, Nilda Rukstelle saw plaintiff's boarding pass with the affixed upgrade stickers, she alerted Lead Agent Moraima Cotto that there was a problem and

told her to read the remarks in plaintiff's PNR. Cotto recalls reading only the original remarks entered in Miami, on the previous day. Cotto then boarded the airplane in order to confront Galbut about his ticket. According to plaintiff, Cotto approached him and asked if his name was Russell Galbut. At that time plaintiff was preparing to begin a self-relaxation exercise designed to minimize discomfort stemming from panic attacks experienced by plaintiff when flying. When plaintiff answered affirmatively, Cotto "announced into her hand-held radio, in a loud and hostile voice and in the presence of other passengers and crew member, the words: 'I caught him, I got him.'" Plaintiff asked Cotto to speak quietly and explain what was happening. Cotto answered that Galbut had illegally placed stolen upgrade tickets on his ticket, that he was trying to steal the passageway, and that if he did not give her his credit card to pay an additional fare she would have him removed from the plane and arrested.

According to plaintiff, he again asked Cotto to be quiet and informed her that he had paid $320.00 at the Admirals' Club before boarding the flight. Cotto responded by calling plaintiff a liar and demanded proof that he had paid for the stickers. Plaintiff produced his receipt for her, and she left the plane, telling him that she "would see about that."

When Cotto returned to the plane, she threw the receipts and ticket information at Galbut and said, "Thank you very much." She also entered the following remarks in the PNR:

UNABLE TO COLLECT THE FARE DIFFERENCE FROM PASSENGER DUE TO DEPARTURE TIME. PASSENGER WAS AWARE OF THE FARE DIFFERENCE FROM Y/C [COACH] TO F/C [FIRST CLASS]. SPOKE TO PASSENGER ABOUT THE SITUATION. PASSENGER ALLEGES HAT ADMIRAL'S CLUB ADVISED HIM TO PURCHASE UPGRADE STICKERS FOR WHICH HE PAID $320.00 I WILL SEND MESSAGE TO MIAMI TO MEET UPON ARRIVAL TO COLLECT THE

DIFFERENCE. PER LEAD AGENT MORAIMA COTTO.

When the plane landed in Miami, plaintiff heard an announcement over the plane's public address system, asking Russell Galbut to identify himself to the agent at the door. When he did so, several agents escorted plaintiff from his seat to the jetway, where agent Tighe–Rodriguez was waiting for him. Tighe–Rodriguez identified herself as being the airlines' Fraud Prevention Division and informed plaintiff that she would be detaining him because he was carrying fraudulent upgrade stickers and had not paid for his ticket. Plaintiff asked to see a supervisor which Tighe–Rodriguez responded that she was in charge. Tighe–Rodriguez then asked an assistant whether the Metro–Dade police had arrived, and told plaintiff that she was detaining him for the police. Galbut then gave Tighe–Rodriguez all his ticket and upgrade information, told her how to contact him, and left the scene. As he was leaving the airport he observed two Metro–Dade police officers entering the airport accompanied by American Airlines flight attendants.

### PROCEDURAL HISTORY

Plaintiff instituted this action, alleging claims of slander per se, false arrest, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, and breach of contract, based on the events discussed above. Defendant has moved for summary judgment.

### DISCUSSION

#### A. *Summary Judgment Standard*

Summary judgment is appropriate where "no genuine issue as to any material fact [exists] and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The initial burden of demonstrating the absence of a genuine issue of material fact rests with the party moving for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to set forth specific facts that demonstrate that a genuine triable issue

exists. *Id.* at 324, 106 S.Ct. 2548. A genuine issue of fact exists if sufficient evidence shows that a reasonable jury would return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To satisfy this burden, the non-movant must procure specific facts that go beyond the pleadings, affidavits, depositions, interrogatory answers, and admissions on file. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

In considering a motion for summary judgment, the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *Gibson v. American Broadcasting Companies, Inc.,* 892 F.2d 1128, 1132 (2d Cir.1989); *United States v. Certain Real Property and Premises Known as 44 Autumn Avenue, Brooklyn, New York,* 156 F.R.D. 26, 31 (E.D.N.Y.1994).

B. *Preemption Under the Federal Aviation Act*

Defendant American Airlines has filed a motion for summary judgment arguing that plaintiff's claims are preempted by the Airline Deregulation Act, 49 U.S.C.A. § 41713 (1995) (formerly 49 U.S.C.A. § 1305) (hereinafter "ADA"). Defendant argues that plaintiff's allegations regarding the conduct of the American Airlines agents squarely fit within the preemptive reach of the ADA. After an examination of the ADA, the legislative purpose behind its enactment, and case law, this Court agrees.

In 1938, Congress enacted the Civil Aeronautics Act which, in turn, created the Civil Aeronautics Board (hereinafter "CAB"). Congress granted CAB the authority to "regulate entry into the interstate airline industry, the routes that airlines could fly, and the fares that they could charge consumers." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 422, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (Stevens, J., dissenting). In creating the Act, Congress restricted the CAB's power by providing a "savings clause" that did not eliminate the available common law and statutory remedies. 15 U.S.C. § 1106 (1938), 52 Stat. 1027.

In 1958, Congress replaced the Act with another substantially similar regulatory plan [1] which remained unchanged for twenty years. In 1978, Congress discontinued federal regulation over the interstate airline industry. To effectuate its decision and foster competition within the industry, Congress enacted the ADA to provide "efficiency, innovation ... low prices, and to determine the variety, quality, and price of air transportation services." H.R.CONF.REP. NO. 95–1779, p. 53 (1978), U.S.CODE CONG. & ADMIN.NEWS 1978, 3737. To prevent the states from entering the economic regulatory field and thereby frustrating Congress' goal, an additional provision was enacted such that "a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." [2] 49 U.S.C.A. § 41713(b)(1) (formerly 49 U.S.C.A. § 1305(a)(1)). The CAB explained that, *inter alia,* this section was intended to prevent states from "interfer[ing] with the services that carriers offer in exchange for their rates ... [and accordingly,] preemption extends to all of the *economic factors* that go into the provision of the quid pro quo for [a] passenger's fare, including flight frequency and timing, liability limits, reservation and boarding practices, insurance, smoking rules, meal service, entertainment, bonding and corporate finance...." 44 Fed.Reg. 9948, 9950–9951 (1979) (emphasis added). The modified Act retained the savings clause pertaining to common law and

---

**1.** Federal Aviation Act of 1958, Pub.L. 85–726, 72 Stat. 731.

**2.** In July 1994 Congress repealed, revised, and recodified the Federal Aviation Act. In doing so, Congress enacted 49 U.S.C. § 40101, *et seq.* (1995), which replaced 49 U.S.C. § 1305, *et seq.* (1994) without substantial change. The revisions were minor while the substance of the section was retained. The legislative history reveals that Congress intended to "restate in comprehensive form, without substantive change, certain general and permanent laws related to transportation and ... to make other technical improvements in the Code." H.R.Rep. No. 180, 103d Cong., 2nd Sess. 1 (1993) reprinted in 1994 U.S.Code Cong. and Admin.News at 818.

statutory remedies.[3] Although the statute is silent as to which state law claims are and are not preempted by Section 41713(b)(1), the Supreme Court, in interpreting the language of the ADA, has held that all "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' are preempted...." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).[4] Despite *Morales'* expansive reach, the Court explicitly recognized that " '[s]ome state actions may affect [airline rates, routes or services] in too tenuous, remote or peripheral a manner' to have a pre-emptive effect." *Id.* at 390, 112 S.Ct. 2031 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). In effect, the *Morales* Court did not hold that *all* claims that relate to prices, routes and services are preempted, rather only those that directly seek to regulate prices, routes and services. *See Abdu–Brisson v. Delta Air Lines, Inc.*, 96–7721, 128 F.3d 77, 80–81, 1997 WL 631842, *2 (2d Cir. Oct.15, 1997).

### 1. Breach of Contract Claim

Subsequent to *Morales*, the Supreme court determined that claims that an airline breached its agreement with its passengers under its frequent flyer program are not preempted. *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 224–26, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). That holding has been interpreted to mean that no breach of contract claim by a passenger against an airline shall be preempted. *See, e.g., Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir.1996); *Chukwu v. Board of Directors Varig Airline*, 880 F.Supp. 891, 895, 900 (D.Mass.1995); *Chrissafis v. Continental Airlines, Inc.*, 940 F.Supp. 1292, 1297–98 (N.D.Ill.1996). As a result, plaintiff's breach of contract claim in this case shall not be preempted.

### 2. Tort Claims

Based on the *Morales* ruling, the scope of the word "services" has proven critical in preemption analysis with respect to tort claims, although no singular definition has emerged despite repeated scrutiny. *See, e.g., Travel All*, 73 F.3d at 1433; *Peterson v. Continental Airlines, Inc.*, 970 F.Supp. 246, 249–50 (S.D.N.Y.1997); *Trinidad v. American Airlines, Inc.*, 932 F.Supp. 521, 524–26 (S.D.N.Y.1996); *In re Hijacking of Pan American World Airways, Inc.*, 920 F.Supp. 408 (S.D.N.Y.1996); *Von Hundertmark v. Boston Professional Hockey Ass'n, Inc.*, No. CV–93–1369(CPS), 1996 WL 118538, *5–7 (E.D.N.Y. March 7, 1996); *Rombom v. United Air Lines, Inc.*, 867 F.Supp. 214, 219–222 (S.D.N.Y.1994); *Stagl v. Delta Air Lines, Inc.*, 849 F.Supp. 179, 181–83 (E.D.N.Y.1994), *rev'd on other grounds*, 52 F.3d 463 (2d Cir.1995); *Cannava v. USAir, Inc.*, No. 91–30003–F, 1993 WL 565341, *4–5 (D.Mass. Jan 7, 1993); *Lawal v. British Airways, PLC*, 812 F.Supp. 713, 719–20 (S.D.Tex.1992); *Howard v. Northwest Airlines, Inc.*, 793 F.Supp. 129, 132 (S.D.Tex.1992); *Von Anhalt v. Delta Air Lines, Inc.*, 735 F.Supp. 1030, 1031 (S.D.Fla.1990). *See also Abdu–Brisson v. Delta Air Lines, Inc.*, No. 96–7721, 128 F.3d 77, 83–84, 1997 WL 631842, at *5 (2d Cir. Oct.15, 1997) ("The 'related to' language of the ADA provides neither a predictable nor practical formula for distinguishing preempted from non-preempted state and local laws...."). In fact, I have previously adopted a definition of service that includes activities that clearly have ties to the economy of the industry such as overbooking and bumping. *See Lanza v. American Airlines*, No. 93–CV–4246(JMA), (E.D.N.Y. May 23, 1996) (memo & order). Hence, in this case defendant American Airlines contends that plaintiffs' claims are preempted because they are connected to services that the airline provides, specifically, ticketing, seating, and upgrade procedures. But while some courts have made the preemption determination solely by deciding whether the airline's con-

---

**3.** "A remedy under this part is in addition to any other remedies provided by law." 49 U.S.C.A. § 401401(c) (1995) (formerly 49 U.S.C.A. § 1506).

**4.** The Court was presented with the prior version of 49 U.S.C.A. § 41713, 49 U.S.C.A. § 1305, which contained the words "rates, routes, or services" instead of the present text of "prices, routes, and services."

duct directly relates to a service, a recent trend suggests that the service definition is only one element of the analysis. *See Peterson,* 970 F.Supp. at 250–51; *Rombom,* 867 F.Supp. at 221–22.

In *Rombom v. United Air Lines, Inc.,* 867 F.Supp. 214 (S.D.N.Y.1994), Judge Sotomayor set forth a tripartite test for preemption. The Court must first determine whether the activity at issue in the claim is a service. If the activity is deemed to be a service, the court must then ascertain whether the claim affects the airline service directly or tenuously, remotely, or peripherally. Finally, the Court must determine whether the underlying tortious conduct was reasonably necessary to the provision of the service. *Id.* at 222. The Court warned that "[I]f the tortious act did not occur during the service . . . or . . . did not further the provision of a service in a reasonable manner, then the state tort claim should continue." *Id.* The *Rombom* test has been employed recently by other judges within this Circuit. *See, e.g., Peterson,* 970 F.Supp. at 250–251; *Von Hundertmark,* 1996 WL 118538, at *6.

■ Application of the *Rombom* test clearly indicates that plaintiff's claims should be preempted. First, the activities at issue in plaintiff's claim, that is the agent's refusal to permit plaintiff to upgrade using the gold stickers and the demand for payment for the upgrade, are services. *Travel All* 73 F.3d at 1434; *Lanza v. American Airlines, Inc.,* No. 93–CV–4246(JMA) (E.D.N.Y. May 23, 1996) (memo & order); *Rombom,* 867 F.Supp. at 221–22, 223; *Cannava,* No. 91–30003–F, 1993 WL 565341, at *4–6; *Lawal,* 812 F.Supp. at 719–20.

■ Second, the claim affects airline service directly, rather than tenuously, in that it relates specifically to defendant's upgrade policies and the manner in which defendant's employees carry out those policies when they believe that a passenger is not properly ticketed. *Rombom,* 867 F.Supp. at 222 (citing *Williams v. Express Airlines I, Inc.,* 825 F.Supp. 831 (W.D.Tenn.1993) (claims stemming from airline's refusal to allow plaintiff on board directly implicate airline services because they "immediately arise from the denial or allegedly *inadequate*

*provision of* such services") (emphasis added)). *Cf. Abdu–Brisson,* 128 F.3d 77, 85–86, 1997 WL 631842, at *8 (seniority policies which discriminate on basis of age do not affect airline services). And finally, assuming plaintiff's version of facts to be true, I find that the underlying, allegedly tortious conduct furthered the provision of service in a reasonable manner. Specifically, plaintiff's allegations amount to the following: that defendant did not provide an upgrade to first class with the stickers owned by plaintiff, that defendant wrongfully accused plaintiff of stealing the stickers, that defendant required payment for the upgrade to first class, that defendant entered remarks into plaintiff's PNR indicating a problem with his ticketing, that defendant mistakenly permitted plaintiff to purchase upgrade stickers at the Admiral's Club, that defendant confronted plaintiff on the plane in an overbearing manner and again accused him of stealing stickers causing plaintiff's panic attack to escalate, that defendant announced a request for plaintiff to identify himself at the gate, and that defendant detained plaintiff and told him that the Metro–Dade police had been summoned. Plaintiff does not dispute that he was permitted to upgrade to first class, that he was permitted to remain in first class on both flights, that he never was physically restrained by defendant's agents, and that he left the Miami airport of his own volition. I find that none of that conduct was outrageous or obviously violative of plaintiff's rights. *Compare Rombom,* 867 F.Supp. at 223 (crew's rude reprimands when requiring passenger to be quiet were not unreasonable or outrageous) *with Peterson,* 970 F.Supp. at 250 (conduct not reasonable where passenger was handcuffed and physically removed from airplane without explanation by police officers summoned by flight crew acting in abusive, unprofessional and malicious manner). Even if plaintiff is correct that the agents did not deal with his ticketing situation with the utmost of respect, none of the behavior alleged is sufficiently offensive to be characterized as unreasonable. As such, under the *Rombom* analysis, plaintiff's tort claims, that is, slander per se, false arrest, false imprisonment, intentional infliction of emotional dis-

tress, negligent infliction of emotional distress, and negligence, are preempted.[5]

In addition, I find that this disposition conforms to the principle often expressed in preemption cases, that "matters about which the airlines wish or are likely to compete should be preempted." *Sedigh v. Delta Airlines, Inc.*, 850 F.Supp. 197 (E.D.N.Y.1994) (rather than rely on definition of "service," court looks to whether claim involves competitive matters); *see also Doricent v. American Airlines, Inc.*, No. 91–12084Y, 1993 WL 437670, *4–5 (D.Mass. Oct.19, 1993); *Pittman v. Grayson*, 869 F.Supp. 1065, 1074 (S.D.N.Y.1994); *Singh*, 920 F.Supp. 408, 415, 1996 WL 67868, *6; *Peterson*, 970 F.Supp. at 251. Undoubtedly, the cost of an upgrade, for regular passengers or for AAdvantage or Gold AAdvantage members, is competitive matter, and, in keeping with the intent and spirit of the ADA, an airline should not be subject to individual suit every time a passenger is dissatisfied with the manner in which the airline's agents attempt to enforce the upgrade policy.[6] *Cf. Abdu–Brisson*, 128 F.3d 77, 83–85, 1997 WL 631842, at *5–7 ("Permitting full operation of New York's age discrimination law will not affect competition between airlines—the primary concern underlying the ADA. Unlike the marketing practices at issue in Morales or the regulation of frequent flyer programs at issue in Wolens, whether an airline discriminates on the basis of age ... has little or nothing to do with competition or efficiency.").

## C. *Breach of Contract Claim*

As noted above, plaintiff's breach of contract claim is not preempted. Nevertheless, defendant also has moved for summary judgment on this claim based on plaintiff's failure to establish a genuine issue of material fact. In order to prevail on this motion, defendant must show that, when the facts are viewed in the light most favorable to plaintiff, no genuine issue of material fact exists with regard to the claim. *Gibson v. American Broadcasting Companies, Inc.*, 892 F.2d 1128, 1132 (2d Cir.1989); *Von Hundertmark*, 1996 WL 118538, at *8.

The facts as alleged by plaintiff should be familiar by now. In making his claim for breach of contract, plaintiff states that he and defendant entered into a contract when he purchased his tickets for the New York to Miami and Miami to New York flights on December 2 and 3, 1994. He alleges that by engaging in the conduct described above, defendant breached that contract.

Under New York law, plaintiff must prove four elements to sustain a breach of contract: formation of a contract between parties, performance by plaintiff, breach by defendant and damages. *Reuben H. Donnelley Corp. v. Mark I Marketing Corp.*, 925 F.Supp. 203, 206 (S.D.N.Y.1996). Assuming that plaintiff did indeed enter a contract with defendant by purchasing the airline tickets, and that he did perform by paying for the tickets, plaintiff has failed to establish any fact that even suggests a breach of that contract. First, plaintiff does not contend that he was not permitted to board or remain on board for the duration of either flight. Second, even assuming that the contract was

---

**5.** unlike in *Rombom*, the conduct on which the false imprisonment and false arrest claims are based was reasonable. The first and most obvious distinction is that in *Rombom* the plaintiff was placed under arrest by police officers; here, plaintiff plainly admits that he was not physically restrained, that he never was detained by police officers, who were apparently summoned, and that he left the airport of his own volition. A second distinction is that in *Rombom* the plaintiff alleged that the arrest was based on spite and malice; whereas in this case, even in the light most favorable to plaintiff, it appears that the threat of arrest was made in order to attend to what was perceived by the airline to be an unauthorized or improperly issued upgrade. Under the *Rombom* analysis, the request for police as-

sistance under the circumstances is reasonable. *Rombom*, 867 F.Supp. at 224.

**6.** Even if the *Rombom* tripartite test is not employed, the alleged facts in this case are substantially similar to those in several cases where preemption was proper. *See, e.g., Lawal, Travel All; Cannava; Von Anhalt.* I find, however, that there also are other factually similar cases that have not been preempted. Because the various courts have not applied a uniform analysis or objective test for preemption, *Abdu–Brisson*, 128 F.3d 77, 82–83, 1997 WL 631842, at *4, there is a lack of a clear delineation between the two groups of cases. As a result, I find that *Rombom* provides the most concrete and cogent method of determining whether a claim is preempted.

for a seat in first class (which I am not convinced it was), plaintiff does not dispute that he sat in first class for the duration of both flights. Third, plaintiff has not even alleged that the contract entitled him to a free upgrade, so the defendant's requirement of payment for that upgrade cannot be considered a breach.

Furthermore, plaintiff urges the court to interpret a certain line of cases to mean that the establishment of tortious conduct by the airline amounts to a breach of contract. (Pl.'s Mem. at 18.) There are two flaws in plaintiff's argument: first, because the tort claims have been preempted, there is no finding of tortious conduct from which to make the breach of contract inference. Second, the cases cited by plaintiff hold only that an airline's duty of care may arise from its contractual relationship with its passengers. *See Jaffess v. Home Lines, Inc.*, No. 85–CIV–7365(MJL), 1988 WL 42049 (S.D.N.Y. April 22, 1988); *Ricci v. American Airlines, Inc.*, 226 N.J.Super. 377, 544 A.2d 428, 431 (N.J.Super.A.D.1988), *cert. denied,* 113 N.J. 639, 552 A.2d 165 (1988); *Brown v. Fifth Avenue Coach Lines, Inc.*, 16 Misc.2d 692, 695, 185 N.Y.S.2d 923, 927 (N.Y.Mun.Ct. 1959). This is a basic principle of tort law, analogous to a doctor's duty of care arising from her relationship with a patient, or a host's duty of care arising from his relationship with a guest in his home. 57A AM.JUR. NEG. § 119. Contrary to plaintiff's argument, these cases do not espouse the principle suggested by plaintiff, that any finding of tortious activity establishes a breach of contract.

As a result, I find that plaintiff cannot establish a genuine issue of material fact with respect to his breach of contract claim.

## CONCLUSION

In sum, Congress sought to discourage states from enacting numerous and conflicting regulations that deal with airline prices, routes and services. Permitting state tort remedies in this action would be at odds with Congress' goal of encouraging the free market competition of air carriers with respect to the ticketing, pricing, and upgrading services they provide. Those claims are, therefore, preempted, and defendant American Airlines's motion for summary judgment on the tort claims is granted.

With respect to the breach of contract claim, while it is not preempted, plaintiff has failed to establish a genuine issue of material fact. Defendant American Airline's motion for summary judgment therefore is granted on this claim as well.

SO ORDERED.